96  201
97  146
97  147

## Wytheville.

### FRANCIS v. CLINE AND ANOTHER.

#### JULY 7, 1898.

1. TRUST AND TRUSTEES—*Implied and Resulting Trusts—Parol Evidence to Establish Trust—Case in Judgment.*—The evidence in this case shows that the land of the appellant, the title to which was vested in her husband as trustee for her sole and separate use, was conveyed to the appellee, W. G. Cline, and though no trust was declared in the deed it was understood between the parties that he was to hold it for her benefit. The trust, whether implied or resulting, may be established by parol, and has been so established in this cause. And though the land was exchanged for other lands, the land received in exchange is still in the hands of the appellee, and will be impressed with the same trusts as the original tract. Courts of equity follow property impressed with a trust into whatsoever guilty hand it may go.

2. PRINCIPAL AND AGENT—*Voidable Acts of Agent—Ratification by Principal—Full Disclosures by Agent.*—Loyalty to his trust is the most important duty which an agent owes to his principal. The dealings of an agent with his principal are closely scrutinized, and the voidable acts of the agent will not be deemed to have been confirmed by the principal except after the fullest disclosure by the agent. Confirmation must be a solemn and deliberate act of the principal, after full disclosure by the agent. If the principal's right to impeach a transaction be concealed from him, or a free disclosure be not made to him of every circumstance which it is material for him to know, or if confirmation takes place under pressure or constraint, or by the exercise of undue influence, or under the delusion that the original transaction is binding on him, or if it be merely a continuation of the original transaction, the confirmation amounts to nothing.

3. FRAUD IN PROCUREMENT OF JUDGMENT OR DECREE—*Case in Judgment.*—If it be alleged and proved that a judgment or decree was procured by fraud, it ceases to protect the wrong-doer, or to obstruct the injured party in the assertion of his rights. In the case in judgment the agree-

ment to dismiss the original suit instituted by the appellant was pro-
cured by the fraud of the appellees, and hence the order of dismissal
is without effect.

Appeal from a decree of the Circuit Court of Tazewell county
pronounced April 24, 1897, in a suit in chancery wherein the
appellant was the complainant, and the appellees were the de-
fendants.

*Reversed.*

The opinion states the case.

*Henry & Graham,* for the appellant.

*Chapman & Gillespie* and *S. W. Williams,* for the appellees.

CARDWELL, J., delivered the opinion of the court.

The appellant, Mary E. Francis, has been thrice married.
Her only children are two sons, William G. and J. M. Cline,
of the first marriage. Under the will of her second husband,
Henry Litz, who died about 1880, she acquired property to the
amount of about $2,000, and in 1883 she married her present
husband, T. L. Francis, and with her means she bought a
farm in Washington county containing 102 acres (spoken of in
this record as the Washington county land), and it was con-
veyed to her husband, T. L. Francis, in trust for her sole use
and benefit. They moved upon this farm in 1884, and stocked
and improved it, so that in 1891 it was generally regarded as
worth $3,000. In the early part of 1891 some contentions
arose between Mrs. Francis and her husband, growing, as she
says, out of an idea that he had some interest in the property,
and he was urging her to make a conveyance of it to him, which
she declined to do because she intended that her two sons
should have it. In March, 1891, she visited her son, William
G. Cline, who resided in Tazewell county, and conferred with

him as to how the title to the property could be gotten out of
her husband, and solicited him to take charge of the matter
for her.    Later on he visited his mother at her home in Wash-
ington county, and an agreement was reached whereby T. L.
Francis was to convey the title to the Washington county land
to Mrs. Francis, and she to release to him all claim to, or in-
terest in, a small tract of eight acres of land adjoining her own
belonging to T. L. Francis, and in addition thereto, he was to
have a portion, at least, of the stock on her place.    Accord-
ingly, on March 16, 1891, T. L. Francis made a deed convey-
ing the land directly to Mrs. Francis, and on the same date
another deed was prepared whereby T. L. Francis and his wife
were to convey the land to William G. Cline.    This deed was
signed and acknowledged by Mrs. Francis only before a jus-
tice of the peace on March 23, 1891, but neither of these deeds
was ever recorded.    On his way from his mother's, after the
deed of March 16, 1891, from T. L. Francis to his wife had
been executed and delivered to him, W. G. Cline went to see
A. J. May, a lawyer residing in Tazewell, and stated to him
that he wished to get some advice for the benefit of his mother,
but did not employ May as an attorney, or pay him any fee
for his services.    He stated to May that his mother was in
some trouble with her husband; that they had separated; that
his mother owned a tract of land in Washington county; that
her husband was claiming that he had an interest in it, and
that she had made some arrangement with him to convey his
alleged interest in the land to her; in fact, as May states, he
showed him a deed from the husband to his wife for his inter-
est in the land.    The advice given by May was that, while the
conveyance might be good in equity, he thought that it would
be better to get Francis and his wife to convey the land to him
(W. G. Cline) for an alleged valuable consideration, and the
sum of $3,000 as the consideration was suggested either by
May or W. G. Cline, and that Cline execute to his mother his
note for that amount, with an understanding between them

that he could lift it at any time thereafter by reconveying the land to her, or by selling the land and reinvesting the proceeds in other land for her. After this interview with May the deed already signed and acknowledged by Mrs. Francis to W. G. Cline was presented to her husband for his signature and acknowledgment, but he declined positively to execute it, because, as he said, he did not have the same confidence in W. G. Cline that Mrs. Francis seemed to have.

On May 5, 1891, another deed was written, and was signed and acknowledged by Mrs. Francis, conveying this land to W. G. Cline, but this deed was never recorded. This deed, and the one dated March 16th, signed by Mrs. Francis, named $3,000 as the consideration for the conveyance. After this last named deed was executed by Mrs. Francis, W. G. Cline went again to his mother's home, in Washington county, advised his mother, as he admits, to separate from her husband, and obtained the consent of the husband to sign and acknowledge a deed with Mrs. Francis, conveying the Washington county land to him, and these parties at once went to the law office of Mr. Humes, who prepared a deed conveying the land from Francis in his own right, and as trustee for Mrs. Francis, and Mrs. Francis to W. G. Cline. This deed was duly executed on May 12, 1891, acknowledged and recorded on the 13th of May of the same year, but, as Humes died shortly thereafter, what transpired in his office between these parties is not known, except from their own statements. Mrs. Francis remained on the Washington county land until the fall of 1891, when she went to the home of her son, W. G. Cline, in Tazewell county, and remained for some months.

In April, 1892, by an agreement between her and W. G. Cline, the Washington county land was exchanged for ninety-two acres of land in Tazewell county, near W. G. Cline's land, spoken of in this record as the "Spratt" land, or "Gravatt creek" land. The deed from C. C. Spratt and wife, conveying this ninety-two acres of land to W. G. Cline, bears date April

12, 1892, but was not recorded .until September 14, 1892.
Shortly after this exchange of land, J. M. Cline took posses-
sion of the Spratt land, and Mrs. Francis, on learning that it
was claimed by W. G. and J. M. Cline that she did not have
any interest in the land, caused to be served on J. M. Cline,
in December, 1892, a written notice that she would expect him
to deliver possession of this land to her on the 1st of January,
1893, or pay her rent for it.  J. M. Cline disregarded this
notice, and remained in possession of the land, and refused to
pay Mrs. Francis rent, and in June following, Mrs. Francis
instituted her suit in the Circuit Court of Tazewell county
against W. G. and J. M. Cline, in which she recites the exe-
cution of the deed of May 12, 1891, by herself and husband
to W. G. Cline, the exchange of the Washington county land
for the Spratt land, and says that the Spratt land was conveyed
to W. G. Cline upon the distinct understanding that he was to
hold it upon the same trust that he had held the Washington
county land; that the Washington county land was conveyed
to W. G. Cline upon the condition and stipulation that he
would hold the same in trust for her, and reconvey it to her at
her request, or pay her the sum of $3,000 when the land was
sold; that at the time of the execution of the deed, W. G.
Cline executed and delivered to her a bond or note for the
sum of $3,000, in which this agreement was set forth, as she
then remembered; and that this bond or note was left in the
possession of J. M. Cline, her other son.  She then says that she
had requested W. G. Cline to convey to her the Spratt land,
and had given him written notice to deliver her possession of
the same, but that he refused to convey it to her, or deliver to
her possession thereof.

The prayer of her bill is that J. M. Cline be required to
produce and surrender to the court, or account for, the bond
which he had hitherto refused to deliver to her, and that
W. G. Cline be required to convey the Spratt land to her, &c.

To this bill W. G. and J. M. Cline filed their joint answer,
in which they deny that W. G. Cline was to hold the Wash-

ington county land, or the Spratt land, in trust for the complainant, or that W. G. Cline executed the $3,000 note to her, and then say, by way of explanation of the whole transaction, that the complainant was indebted to W. G. Cline in the sum of $1,034, with interest, since the latter part of the year 1880, being money which he advanced her just after the death of her second husband; that in the conversation between respondent, W. G. Cline, and his mother, with reference to the trouble between her and her last husband, she told respondent that her husband had been endeavoring to induce her to convey the land to him, but that she did not intend to do it, as she intended her land for her sons, but that she first wanted respondent, W. G. Cline, to be paid what she owed him out of this land; that complainant finally left her home, and came to the home of W. G. Cline, and said that she had left her husband, and would not live with him any more, and wanted W. G. Cline to have a suit brought for a divorce and a division of the property; that respondent, W. G. Cline, again advised her to avoid a suit, and told her that she had better agree with her husband upon a division of the property; that she then told W. G. Cline to go and make a settlement with T. L. Francis; that she wanted the land secured, and that she intended it to go to W. G. Cline, but wanted him to provide something for J. M. Cline; that W. G. Cline then went to see Francis again, and, with the advice of respondent, W. G. Cline, complainant and her husband agreed to live separate and apart and make certain division of the property in which T. L. Francis was to convey any interest which he had in the Washington county land to her—respondent, W. G. Cline, advising that in making the compromise Francis should convey it to complainant, thinking that he would more readily convey to her than to W. G. Cline. But W. G. Cline, having some doubts as to the validity of such a transaction, decided to confer with some lawyer about the matter, and was advised that such a deed would not be good, and that his mother and Francis had better

unite in a deed conveying the property to himself, or to some other person in trust for his mother; that, in the meantime, the complainant was living at the house of W. G. Cline, and he had stated to her that the deed from Francis to her would not be sufficient, and also the further advice of counsel as to how it should be deeded; that thereupon the complainant declined to have the land conveyed to any one in trust for her, but wanted him to take the land as his own, on the condition that he would assist his brother, J. M. Cline, who had been unfortunate in business, and was in financial distress. In fact, says this respondent (W. G. Cline), she stated that she wanted respondent to sell the property in Washington county, and invest the proceeds of sale in property in Tazewell county. They further say that, upon this arrangement, W. G. Cline executed an obligation binding himself to make provision for his brother, J. M. Cline. The land in Washington county was conveyed to W. G. Cline, and his obligation was delivered to J. M. Cline; that, after this, the Washington county land, at the instance of the complainant and J. M. Cline, was exchanged for the Spratt land, in Tazewell county, which was also conveyed to W. G. Cline, but possession thereof turned over to J. M. Cline, and that it was agreed by all the parties that whenever J. M. Cline should pay W. G. Cline the sum of $1,500, the Spratt land was to be conveyed to him, and that, pursuant to this agreement, J. M. Cline had already paid the sum of $1,085 to W. G. Cline. They further deny that complainant paid T. L. Francis $1,000 as stated in her bill, and, after averring that respondents are and were at all times ready to provide liberally for their mother, and that their homes were open to her at all times, they conclude with the statement that the complainant was at the home of W. G. Cline, but, without cause, had left it, and respondents believe that her leaving was due to the influence of T. L. Francis, who induced her to leave and bring this suit, with the hope that by making such a breach he might acquire the title to the land himself.

Depositions were taken by the complainant in support of her bill, including the deposition of May, the lawyer, whose advice had been obtained by W. G. Cline as to how the conveyance of the title to the Washington county land from T. L. Francis should be made.

On November 3, 1893, Mrs. Francis signed and acknowledged before J. W. Gillespie, a justice of the peace, a paper dated November 1, 1893, setting forth the pendency of her suit against W. G. and J. M. Cline; that the defendants had made full satisfaction to her of all demands made by her in the suit, and that therefore she thereby granted and released unto W. G. and J. M. Cline all the right, title, and interest in the land asserted by her in the suit, and also released them from all claims and demands, and acknowledged that she had received full consideration for making the release, and agreed to have her suit dismissed without any further proceedings.

At the same time, November 3, 1893, the following papers were executed and acknowledged by William G. and J. M. Cline before J. W. Gillespie, a justice of the peace in Tazewell county:

*Exhibit "Z" with Cross-Bill.*

" This deed, made and entered into on this November 3d, in the year 1893, between W. G. Cline, party of the first part, and Mrs. M. E. Francis, party of the second part, all of the county of Tazewell, and State of Virginia, witnesseth, that for and in consideration of the love and respect that W. G. Cline, party of the first part, has for M. E. Francis, his mother, party of the second part, the said W. G. Cline, party of the first part, *dos* this day deeds and conveys one-half *intrust* of a certain tract, piece, or parcel of land situated in Tazewell county, and on the waters of Lyncon Share Branch, *none* as the Harlis place, and for further *refereances* refers to deed from Mrs. Kroll to W. G. Cline; this deed is to take effect that in the event W. G. Cline, party of the first part, dies before M. E. Francis, party

of the second part, a further considerasion in this deed is that the said W. G. Cline reserves a right to sell or dispose of this land and reinvest its proceeds and said M. E. Francis is to hold and have the same *intrust* as she holds in this deed when reinvested in other lands; the party of the first part doth *covinent* to and with the party of the second part that they have the right to convey to *there* grantee, and that they warrant generalley the title to the lands hereby conveyed.

Witness the following signature and seal, the year and date first above written.

W. G. CLINE,  (Seal)."

*Exhibit "Y" with Cross-Bill.*

" This agreement and contract, made and entered into on this November *8th*, in the year 1893, between W. G. Cline, James M. Cline and Mrs. M. E. Francis, *there* mother, all of the county of Tazewell and State of Virginia. Witnesseth, that the said W. G. and J. M. Cline *dos* this day agree that in the event the said W. G. Cline deeds to the said J. M. Cline the land on which the said J. M. Cline now lives, the said J. M. Cline agrees and binds himself to deed Mrs. M. E. Francis one-half *intrust* in said land in the event the said J. M. Cline dies before she *dos* and if this land is sold she is to have the same right in any other land this money is reinvested in.

Witness our hands and seals this the year and date above written.

W. G. CLINE,  (Seal.)<br>J. M. CLINE,  (Seal)."

At the April term, 1894, of the Circuit Court of Tazewell county a decree was made in the cause, setting forth that, it appearing from an agreement before a justice of the peace, filed with the papers in the cause, the parties had settled and adjusted the matters involved therein, it was therefore ordered that the case be dropped from the docket. This

decree, it appears, was entered as a matter of course, and was not assented to by complainant or her counsel, nor was the presence of either noted so far as the decree discloses. To the same term of the Circuit Court of Tazewell county N. Frank & Co. and others, creditors of J. M. Cline, filed their bill to subject an interest of J. M. Cline in the "Spratt" land to the payment of their judgments. To this bill W. G. and J. M. Cline and Mrs. Francis were made parties defendant.

At the August term of the court, Mrs. Francis was permitted to file her cross-bill against W. G. Cline and J. M. Cline in this suit of *Frank and als.*, out of which this appeal to this court arises.

The appellant repeats in her cross-bill the allegations of her original bill, and avers that when she separated from her husband, her two sons offered her a home and encouraged the separation; that the exchange for the "Spratt" land in the vicinity of the residence of her son, W. G. Cline, had not long been made before he assumed the control of the land, declaring his ownership of it; and his family, at least, made it so disagreeable to complainant that she had to leave his house, and was compelled to go from "pillar to post," homeless, friendless, and alone, in feeble health and illy able to care and provide for herself; that she was in a most deplorable state of mind, and in this condition she was approached for a compromise; that her counsel had set another day to take depositions in her pending suit, and complainant came by her son's (W. G. Cline) late in October, 1893, on the way to the office of her counsel, to see to some household effects she had at her son's, when he began persistently to importune her for an adjustment of the suit; and as she was in no condition to resist anything, so importunate were her sons, it was finally agreed that there should be conveyed to complainant in *fee-simple* an undivided half of the Spratt land, and an undivided half of another tract that W. G. Cline had purchased, known as the Harless land, and her sons were to give her food and clothing, and afford

her such maintenance as would keep her comfortable the residue of her life, all of which was positively agreed to by her two sons, but she wished to see her counsel who was conducting her suit, who lived four or five miles from her sons, before the agreement was consummated, and started there on foot; that W. G. Cline, who preceded her to Tazewell Courthouse, returning, met her on the road, and, as usual, overcame her, and persuaded her to return to his house; that the walk made complainant sick, and as soon as she was able to get about, she was taken by her son (W. G. C.) to the house of J. W. Gillespie, a justice of the peace, and when they arrived there her son (W. G. C.) requested her to sign and acknowledge a paper, which he told her was necessary before the suit could be ended, complainant all the time protesting that she should see her counsel, and her sons urging her to sign this paper; that she did not read the paper, not having her spectacles with her, nor was it read to her, but her sons assured her that this and other papers which " 'Squire Gillespie" would write were just as they had theretofore agreed; that this paper (the agreement for the dismissal of the pending suit) had already been prepared by counsel of her son (W. G. C.), and, after a private talk between her son and " Squire Gillespie," the two papers, exhibits " Y " and " Z " (appearing in full above), were written by Gillespie, signed and acknowledged by the parties, but although complainant wanted to take possession of the paper compromising the suit, her son, W. G. Cline, took it, and never would let her have it, and hastily had it recorded. Complainant protests that she never read these papers at the time they were signed at Gillespie's house, nor were they read to her when written, nor for some time after; that they do not contain the contract and agreement she made with her sons as a compromise of her pending suit; that as the paper executed as a compromise of her suit was obtained by fraud, it is null and void, and that the action of W. G. and J. M. Cline, on the 3d day of November, 1893, was a wilful and deliberate fraud, for she was

then and there induced to surrender land conceded to be worth $3,000 for nothing, as the papers " Y " and " Z " executed to her by her two sons amount to absolutely nothing.

The prayer of her cross-bill is that the transaction of November 3, 1893, be declared null and void; that she be remitted to her rights to the Spratt land, conveyed by Spratt and wife to W. G. Cline, April 12, 1892, and that W. G. Cline be compelled to convey the " Spratt " land to complainant, &c.

W. G. and J. M. Cline made a joint answer to the cross-bill, referring to their answer to complainant's original bill, and ask that it be treated as a part of their answer then made, and after denying the fraud and unfair dealing alleged by complainant, say that they had at all times recognized their liability to support complainant, and were willing to execute to her any writing which would secure to her a support out of their respective estates, provided she should outlive them, but were never willing, and never agreed to vest in her any present estate, for the reason that at times she was very much under the influence and control of her husband, &c., and that respondents believed that if they vested in complainant a present estate her husband would, in some way, succeed in getting control of it, and leave her to be supported by respondents. They then admit that they told their mother she could make her home with them as long as she lived, provided they outlived her, and that they would take the best care of her, and that if she should survive them, they would make provision for her during her life; that they did not execute any writing, and complainant did not request any, showing that she was to make her home with them, and they were to take care of her, for the reason that she well knew that respondents never had and never would deny her this right, and that whenever she could not live with her husband, their homes were open to her; but the writings, however, in regard to the Harless and Spratt lands were executed, so that she might have a sufficient amount for a support, provided she survived them.

The first question for our consideration is, was the Washington county land, by the deed of May 12, 1891, and a cotemporaneous agreement between the parties, conveyed to W. G. Cline as a trust for the benefit of his mother, the appellant?

W. G. Cline admits that he was asked by his mother to take charge of her business, and it is clearly proved that W. G. Cline was confided in to do for her what was necessary to settle the differences between herself and her husband, and to take the legal title to the Washington county land out of her husband, so that he would have no control over it, and have no pretext for claiming an interest in it, and that it was not at first contemplated that the land would be deeded to W. G. Cline, nor that more was then intended than for the husband to convey the land directly to his wife, the appellant, though she may have frequently said that she intended her sons should have her lands—a statement that was quite natural under the circumstances. To make sure, however, that the purpose of his mother, then in view, would be accomplished, W. G. Cline takes the deed from her husband to her of March 16, 1891, to A. J. May, a lawyer who had theretofore been her legal adviser, and told him that his mother was in some trouble with her husband; that they had separated; that his mother owned a tract of land in Washington county; that her husband was claiming that he had an interest in it, and that his mother had made some arrangement with her husband to convey his alleged interest in the land to her. Whereupon May told him that while the conveyance of March 16, 1891, might be good in equity, he thought it would be better to get Mr. Francis and his (W. G. C.'s) mother to convey the land to him for an alleged valuable consideration. The sum of $3,000 was suggested as the consideration, and that he execute to his mother his note for that amount, with an understanding between them that he could lift his note at any time thereafter by reconveying the land to her, or by selling the land and reinvesting the proceeds in other land for her. This much, at least, W. G.

Cline admits, and May says, in addition, that some months after this conference W. G. Cline told witness that Francis and wife had conveyed the land to him, and that he had given his mother the note for $3,000. May, however, says, on cross-examination, that he is not positive that W. G. Cline told him in the subsequent conversation that he had given his note to his mother for $3,000, but he is positive that he told witness that the matter had been arranged, and made the impression upon witness that he had executed the note. The positive statement by appellant is that W. G. Cline did execute and deliver the note to her, and that she turned it over at once to her son, J. M. Cline, to be held as collateral for her note for $500, borrowed from him when she paid for the Washington county land, and in this she is corroborated by her husband, who not only states positively that the note was given to her and turned over to J. M. Cline, but states the contents of the note, as follows: "I promise to pay my mother, M. E. Francis, three thousand dollars for her land in Washington county, when I sell or otherwise dispose of it," and witness adds, "that homestead was waived in it." She is also corroborated as to this $3,000 note by J. W. Gillespie, N. P. Of course W. G. and J. M. Cline deny that such a note was given, but J. M. Cline testifies that the morning after the deed of the 12th of May, 1891, was executed, his mother made W. G. Cline sign a paper agreeing to account to him (J. M. C.) for half of the Washington county land when sold, and turned this paper over to him, while W. G. Cline says that a few days after the 12th of May, 1891, or perhaps the next day, his mother said to him that she was afraid that J. M. Cline would think hard of her for conveying the land to him (W. G. C.), and said "she wanted me to do right by him" (Jim), "and I told her that she had called my attention to that several times, and to tell him to come into the house, and I would give him an instrument of writing that he could make me do right; and I told her if I would take out what she owed me with interest, there wouldn't be anything for Jim, but

I intended to give him half of it, and gave him an instrument of writing to that effect, * * * * and the paper stated that I was to account to Jim for one half of whatever I could realize out of the land."

When asked to produce this paper, both W. G. and J. M. Cline say that, after the Washington county land was exchanged for the " Spratt " land, and the latter came into possession of the " Spratt" land, the paper was turned over to W. G. Cline, and by him destroyed, although J. M. Cline had nothing then to show that he had an interest in the " Spratt " land. When asked if he claimed that he purchased the Washington county land from his mother, or that she gave it to him, W. G. Cline, after some hesitation, says : " She gave it to me, but at the same time she admitted that she owed me the money I have stated in my examination-in-chief."

He had before stated that his mother owed him $1,024 for money she got for cattle he had sold as far back as 1880, and, in an effort to refute the statements of his mother, that she turned the $3,000 note over to J. M. Cline as collateral security for her bond of $500 held by him, he (W. G. C.) had also stated that this $500 bond had been assigned to and was owned by him some time before the Washington county land was conveyed to him, whereby, according to his showing, his mother, on the 12th day of May, 1891, not only owed him $1,024 with interest from 1880, but this $500 bond given in 1884, making a total of principal due him $1,524, yet he then gives J. M. Cline a paper obligating himself to account to him for one half of what might be realized from the Washington county land rated at $3,000.

In addition to the denial of his mother that she owed her son, W. G. Cline, anything, and the production by her of three unpaid notes or bonds of his to her, one dated November 1, 1888, for $85, for a wagon, horse, and cow, another dated November 1, 1893, for $45, and the other for $58, dated —— day of February, 1893, the statement he makes as to her in-

debtedness to him,. and the paper executed and delivered by him to J. M. Cline, does not bear upon its face the impress of truth or reason; and moreover; it is shown that the appellant paid her son, J. M. Cline, a part of the $500 bond, about half of it, after the deed of May 12, 1891, had been made, and that W. G. Cline, in 1882, after his mother became indebted to him, as he says, to the amount of $1,024 in 1880, bought his mother's dower interest in his father's land in Bland county, and paid her $600 in cash for it. After admitting that the notes produced by his mother were all in his own handwriting, W. G. Cline undertakes to explain them, and as to first, claimed that he did not owe it, and his mother had never claimed payment; as to the $45 note, he says that his signature in pencil had been crossed out with a pen, and his signature written under by some one else, although his mother had stated that this was done by him when she called his attention to the fact that his signature in pencil was becoming effaced, and wanted him to give her a new note; and as to the $58 note, dated February, 1893, he had no recollection whatever.

, To explain why the appellant wanted to separate from her husband, make a deed for her land to W. G. Cline and live with her sons, W. G. Cline and his wife, and J. M. Cline, testify that she was not only jealous by reason of her husband's immorality, but was afraid of him; and other witnesses tell the same story as to what the appellant had said about being afraid of her husband; that he had maltreated her; though not a witness is adduced to testify to any ill-treatment by her husband, or that any of his nearest neighbors had ever heard of the alleged misconduct on his part, causing his wife to become jealous. The statements of W. G. and J. M. Cline that appellant told them of cruelty to her on the part of her husband; that he slept with a razor under his pillow, or carried a pistol in his boot; had tried to smother her once or twice with a pillow or the bed clothes; had thrown a club at her, and caused her to fall over a fence, and sustain serious injury; ,

and was leading an improper life with a woman in the neigh-
borhood, especially that of J. M. Cline in which he says that
while he and Francis were walking out on the land once : " I
was deviling him about Hóp Webb's wife, he (Francis) said if
it hadn't been for old Franklin telling your ma a lot of tales
about Hop's wife, she would have made him a deed for the land,
and that there would never have been any trouble between
them," are not only incredible upon their face, but are in con-
flict with the statement of appellant that the only trouble ever
existing between her and her husband grew out of some con-
tention made by him that he had an interest in her land, and
it would be difficult to believe that her two sons would have
been told these things, and not only made no effort to protect
their mother, but permitted her to remain with her husband
nearly eight months after the deed of May 12, 1891, had been
made, and the statements put into the mouth of the mother
by these witnesses are wholly inconsistent with the fact shown
that Francis was almost an invalid from rheumatism and ner-
vous troubles when his wife was induced by her sons to leave
him, and the treatment received by her at the hands of her
husband, who has, after she had been turned out upon the
world, stripped of her property by her sons, taken her to his
home and provided for her.   We might, at great length, review
the testimony of the witnesses for appellees who have testified
to declarations made by appellant that she gave her land to
her sons, but it is sufficient to say that their statements, if
not wholly false, vary, as is usually the case when witnesses are,
trying to tell the same story which is inconsistent with the truth,
and for the further reason that it is by no means impossible
that some of these witnesses, intending perhaps to state the
truth, have distorted expressions that she intended her sons to
have the land; or to give it to them and not her husband, into
declarations that she had given it to them, or it was theirs.
In addition, other witnesses, wholly disinterested, testify that
they heard appellant say in the presence of W. G. Cline, after

the deed for the Washington county land was made to him, that the land was hers. One of these witnesses says that he rented the farm from appellant for the year 1892, with refusal of it longer if she did not sell it, and rented it from her, in the presence of W. G. Cline, in the fall of 1891; that W. G. Cline came to him, and told him that he wanted to sell him his mother's farm, and witness told him that he was not prepared to buy at that time; whereupon W. G. Cline said that she (his mother) would take witness' offer to rent the land, and witness went over to the house of appellant, where the contract for the rental of the land was written by W. G. Cline and signed by witness. While there appellant told witness of grass seed she wanted seeded, &c. Witness also says that W. G. Cline told him at that time that the farm belonged to his mother.

Much effort was made to show that the contract for the rental of the land by this witness was made with W. G. Cline, the contract not being produced, but if this were shown, it is but natural that it was between witness and W. G. Cline, as the title of record was then in the latter's name.

Another witness says that W. G. Cline told him "that they were to pay an amount something like $1,000 to get a sham deed to keep Tom Francis and his stock off his mother's land," and that W. G. Cline always told witness that it was his mother's land, and said so in his mother's presence.

Still another witness says that he was sent by Mrs. Spratt in the winter of 1891–2 to see W. G. Cline with reference to an exchange with him and his mother of the "Spratt" land for the Washington county land, and W. G. Cline told witness that the Washington county land was his mother's, though the deed was in him, and said the deed was so made to get rid of Mr. Francis.

The fact that W. G. Cline is a son of appellant does not, of itself, establish a confidential relation between them, but it is a circumstance to be considered in determining whether or not such relations existed when the transactions giving rise to the

complaint of the mother against the son were had. He admits that his mother confided in him the transaction of her business to a degree at least, and the evidence shows that she executed every paper suggested to her by him as necessary to debar her husband of any possible interest in, or control over, the Washington county land, and confided to him the exchange for the "Spratt" land, and that he did not make the exchange without first consulting her as the owner of the Washington county land.

Notwithstanding the "Spratt" land was conveyed to W. G. Cline, appellant was the real and beneficial owner of it. He had undertaken, as her agent, to first get a conveyance of the legal title to the Washington county land from T. L. Francis, her husband and trustee; and second, to exchange this land for the "Spratt" land, and in doing these things for her, W. G. Cline, in both instances, took a conveyance of the legal title to the land to himself, and these facts being shown, they establish a trust in W. G. Cline for the use and benefit of appellant, and it matters not whether it be denominated a resulting or an implied trust, as both are founded on the presumed intention of the parties, both arise by operation of law upon the transactions of the parties, and the authorities generally concur that both may be established by parol evidence. *Borst* v. *Nalle, &c.*, 28 Gratt. 434; *Bank of U. S.* v. *Carrington*, 7 Leigh 566; *Phelps* v. *Seely*, 22 Gratt. 573; 1 Perry on Trusts, sec. 124.

Wherefore the same trust resting upon W. G. Cline with reference to the Washington county land when exchanged for the "Spratt" land, attached to the last named property when the exchange was made, and he held it in trust for the benefit of appellant.

It only remains to be determined whether or not the agreement to dismiss and the decree dismissing appellant's first suit were procured by fraud.

It is earnestly urged by counsel for appellees that the decree of the court dismissing the suit, upon the exhibition of the

writing given by her November 3, 1893, had binding effect upon appellant as a confirmation of what had gone before, but, as was said by Keith, P., concurring in the opinion in *N. & W. R. Co.* v. *Mills & Fairfax*, 91 Va. 641, " There is no instrument so solemn, there is no judgment or decree so binding, but that, if fraud in its procurement be alleged and proved, it ceases to protect the wrong-doer or to obstruct the injured in the assertion of their rights."

When a person assents that fiduciary relations be established between him and another, the law imposes upon him the duty of so dealing with the trust subject that his conduct and transactions will stand the test of the closest scrutiny. " Loyalty to his trust is the most important duty which the agent owes to his principal. Reliance upon his integrity, fidelity, and ability is the main consideration in the selection of agents; and so careful is the law in guarding this fiduciary relation that it will not allow an agent to act for himself and his principal, nor to act for two principals on opposite sides, in the same transaction. All such transactions are voidable, and may be repudiated by the principal, without showing that he was injured. In such cases the amount of consideration, the absence of undue advantage, and other like features are wholly immaterial. Nothing will defeat the principal's right of remedy, except his own confirmation, after full knowledge of all the facts. Actual injury is not the principle upon which the law holds such transactions voidable. The chief object of the principle is not to compel restitution where actual fraud has been committed, or unjust advantage gained; but it is to prevent the agent from putting himself in a position in which to be honest must be a strain on him; and to elevate him to a position where he cannot be tempted to betray his principal. A confirmation must be a solemn and deliberate act. When the original transaction is infected with fraud, the confirmation of it is so inconsistent with justice and so likely to be accompanied with imposition, that the courts watch it with the

utmost strictness, and do not allow it to stand but on the clearest evidence."

" If a party's right to impeach the transaction be concealed from him, or *a free disclosure be not made to him of every circumstance which it is material for him to know,* or if the act takes place under pressure or constraint, or by the exercise of undue influence, or under the delusive opinion that the original transaction is binding on him, *or if it be merely a continuation of the original transaction,* the confirmation operates as nothing; or, as stated in the latter part of sec. 964, 2 Pom. Eq., if the original undue influence still remains, or if the act is simply a continuation of the former transaction, or　*　*　*　*　if he has not full knowledge of all the material facts, and of his own rights, no act of confirmation, however formal, is effectual, the voidable nature of the transaction is unaltered." *Ferguson* v. *Gooch,* 94 Va. 397; Kerr on F. & M., 296, 297, 298; *Cumberland Coal Co.* v. *Sherman,* 20 Md. 117; *Hoge* v. *Hoge,* 1 Watts 163, 26 Amer. Decs. 52; *Michoud* v. *Girod,* 4 How. 503; and *Broadus* v. *Broadus,* 3 Call. 546.

In the light of the foregoing well recognized rules of law let us examine the evidence as to how the agreement of compromise and the decree dismissing appellant's first suit was procured. It will be observed, in the first place, that, in the agreement or compromise, appellant is made to say, " and does hereby acknowledge that she has received a full consideration for making this release." By concession she got nothing in the way of a consideration for the release of her rights and the dismissal of her suit, except what is provided for her in the papers " Y " and " Z," copied above. The reservations in " Z," signed by W. G. Cline, are such as to work no change of title in him to the property referred to. He says in the paper that it is made in consideration of love and respect for his mother, but claims in his answer that it is in consideration of the dismissal of the suit. He pretends to convey to his mother " one half *intrust* " in a certain piece of land which he owned, known

as the Harless place, but it was not to take effect if he outlived his mother. She has no rights in it while he lives, and it is shown that there was a vendor's lien on the land for $1,000 and more, November 3, 1893, and it has never been paid.

"Y," signed by both of the Clines, is to the effect only that they will convey to appellant "one half *intrust*" in the "Spratt" land, conditioned upon two events: First, if W. G. Cline should deed it to J. M. Cline; and second, if J. M. Cline dies before his mother. J. M. Cline at that time, if he ever did, held no written obligation of W. G. Cline for a convey-ance of the land to him, and it is conceded that J. M. Cline was a bankrupt, as W. G. Cline had said that J. M. Cline could own no property in his own name on account of debts against him.

These papers, upon their face, when read in the light of the fact shown that it was strenuously urged upon appellant by the Clines when executed, that there was no reason for them to be recorded, if this was not, in fact, imposed as a condition upon their delivery to her, amount to nothing more than a sham and a delusion.

The appellant tells how the agreement of compromise was obtained, as follows: "I was at Graham, and got notice that W. G. Cline would take depositions on the 28th of October. I came up a few days before, and went to Gordon's (W. G. C.) house to see after some bedding and other things I had there. I walked to town on the day appointed, but all the depositions were not taken; the balance were postponed until the next week. I was fixing to go to town, and Gordon told me that we had better settle this matter ourselves, that it was a disgrace, and that he was ashamed of it. He says: Ma I will do right, if you will. I think the trade we first talked about would be best for you. I will give you a half interest in the Harless place, and a half interest in the Spratt place. I would rather do that, for Jim won't want to move. I will pay the taxes and be at all expense, and pay you $50 a year rent for your half of

the Harless place. I don't know what would be right for Jim to pay, as he has been clearing on the Spratt land, but I will see him to-morrow. I know he will do right in this matter. I remained overnight at Gordon's house. Next morning he started away early, and directly I started to town on foot, and * * * * I met him coming back. He seemed to be excited, and said, 'Ma, where are you going?' I told him I was going to see Mr. Alderson (her lawyer). He said there is no need for that, he had seen Jim, and the offer he had made me was all right with Jim. He says: 'Ma, I will deed you the land, and pay the cost of the suit, and pay you rent,' and begged and talked with me so I agreed to take the offer, and told him I would come on to town and get Mr. Alderson to write the deed. He said, 'There is no use of that'; he didn't want me to see Alderson; he could write as good a deed as Alderson; that we could go to 'Squire Gillespie's, and fix up the papers, where it would cost nothing. After hearing his talk, I thought he would do right. He wanted me to go to Mr. Gillespie's, but I was sick from my recent walk, and I told him I wasn't able to go. One morning he said I must go. I was still sick, but went. I asked him if his wife was not going to sign the deeds, and he said, 'No,' it was not necessary; 'I will make you a good deed, and that is all you need to want. I will rent your lands a couple of years, and then buy it back. Want you to keep your deeds private. It will be an expense for nothing to record them.' On the way to the ' 'Squire's ' he told me he had a paper for me to sign. I told him I would not sign it without seeing my lawyer. He said, 'Ma, I wouldn't take no advantage of you. The paper is just simply to stop the law suit. It don't bind you to do anything.' We got to the ' 'Squire's.' I went into the house, and he went to the meadow, where the 'Squire was. After awhile they both came in. The 'Squire commenced writing. I was quite sick, feeling very bad. I was in and out of the house several times during the writing. Jim came

in during the time, and wrote something on a paper, as if to write his name. The 'Squire held the paper to the fire to dry, and said that he would read it. Gordon took it out of his hand, and said he could read it. He commenced reading, and read where the land lay, &c., and said it was a good deed. He didn't read anything about his dying before the deed took effect. He asked me to sign the paper of dismissal of the suit. I told him I couldn't, for I didn't have my glasses, and he said I could certainly write my name. I then told him I wouldn't sign it without reading it, and he said he would read it. He picked it up and read a few words of it, and said it read thus and so. He said sign it, and you can read it before I take it to town. He took the paper, and we left the 'Squire's house and went home. In a morning or so, he was fixing to go to town. I asked him for the papers. He gave them to me, and I took the paper of dismissal, and stepped into my room to read it. I hadn't read but a few words of it, before he came in, and said, ' Ma, I want that paper, I am ready to go.' I told him that I would just keep the paper until I could see my lawyer, and have the paper and those deeds examined. He says, ' Damn you and your lawyer,' and grabbed the paper out of my hands, and went out of the room. This treatment from my doted son was mortifying to me, and I was almost frantic over it. To make sure of my deeds I hid them away, and took a cry. I hid them away, and forgot where I hid them for a long time. I went to see my sister in a short time, and when I came back, Gordon told me to ask Bettie, his wife, if I could stay there. I did, and she said it didn't suit her for me to stay. I told him what she said. He told me to go and hunt me a place somewhere. I went, and succeeded in getting to stay with Mrs. Dr. Easly, Bluefield, W. Va. I contracted cold from my exposure, and was taken down sick in a few days. Was confined to my bed. Dr. Easly gave me some medicine. As soon as I got better I came up to Five Oaks. Mr. Jones helped me to get to Gordon's house. I was there

sick for some time.  As soon as I got able to ride, I went to keep house for Jimmy.  I asked Gordon time after time for his note for the rent of those lands as he promised me.  He always put me off, and finally told me that he would not give them to me at all, and in the spring or early part of the summer, Jimmy spoke of homesteading the Spratt place.  I told him that he could only homestead half of it.  He said that I had no half there.  Then I began to think about my deeds. I went to Gordon's house to hunt for them where I had left them.  I hunted for them, but did not find them.  Then I went again, and found them where I had hid them away.  I showed them to a friend of mine, and he told me they were no account.  I was no judge of a deed myself, and did not know how they should read (and she is shown to be very illiterate, unable to read writing unless plain).  I sent them to Mr. Alderson to see what he thought of them.  I wanted Gordon to make the deeds good, and he said he wouldn't.  I told him I would sue him if he didn't."

J. W. Gillespie, who wrote " Y " and " Z," and before whom they and the dismissal agreement were signed and acknowledged November 3, 1893, makes the statement in his deposition that the day these papers were prepared, W. G. Cline and his mother came to his house together; that he was out in a pasture near the house; that W. G. Cline came out to where he was, and while there and before they reached the house, and in the absence of appellant, W. G. Cline told him what kind of papers he wanted prepared; that, without any consultation after he reached the house, he prepared them; that he never read either of these papers to appellant; that his recollection was that when he announced that the papers were ready, that he remarked, " I had better read them, if I could read my own handwrite, and Gord. (W. G. C.) said he thought he could read it; about that time somebody hollored to me from the fence, and I went out of the house "; that they were never read to her in his presence; she did not have her glasses,

and asked him, "'Squire Gillespie," to sign her name for her.

Thus it will be seen that the justice, the only person present, totally disinterested, corroborates appellant as to the manner in which these papers were prepared and executed, and as to the deception practiced upon her by W. G. Cline, in securing her signature to the agreement to dismiss her pending suit, and, in fact, in every material statement made by appellant as to what occurred on that occasion.

A witness who had busied himself in getting up testimony for the Clines in this case, made a persistent effort to get "'Squire Gillespie" to say that the papers were read to appellant and she understood them, and this witness and another testify that Gillespie said in their presence that appellant heard the papers read and understood them, but Gillespie adheres steadfastly to his statement above given.

The record discloses that W. G. Cline was continually approaching witnesses who testified in favor of appellant while they were in attendance before the commissioner. In one breath he and his witnesses would have us believe that his mother left his house to go to West Virginia to obtain a divorce from her husband, and in the next that she was entirely satisfied with the papers prepared November 3, 1893, and the provision thereby made for her, but, being under the influence and control of her husband, was induced by him to bring this suit. The defence he makes is an admission that his mother got nothing for her Washington county land in the shape of a valuable consideration. It is drawn out of both him and J. M. Cline that the papers "Y" and "Z" do not make such provision for their mother as was intended, or that she expected, when she agreed to dismiss her suit, but say that they are bound to take care of her, and would do so anyhow. The production of these papers in the course of the depositions, confessedly excited both of the Clines, if they did not produce consternation, as they doubtless had relied on their being lost or destroyed, and their production may have given rise to

statements by both of the Clines in glaring conflict with the statements made by them in the first suit.

The defence rests wholly on W. G. Cline's original claim to the Washington county land, though doubtless it occurred to him along with the afterthought to claim this land that the further he was removed from this transaction the securer his title was, and hence, after the exchange for the Spratt land, he and his brother are emboldened to deny their mother's right to it, although she released none of her rights by this exchange. Denial is made that he executed the $3,000 note to his mother, when the evidence is almost overwhelming, showing facts and circumstances contradicting him. It is admitted that papers were destroyed after the exchange for the " Spratt " land that might have thrown light on his transactions, and perhaps this gave rise to the significant remark made by W. G. Cline, according to his own witness, when notice was served on J. M. Cline to give his mother possession of the Gravitt land or pay her rent: " I have been driving cut nails, but now I am driving wire nails, and clinching them on both sides."

Courts of equity delight to follow property which has been the subject of a trust into whatsoever guilty hand it may go. There are no innocent purchasers involved in this litigation, and fraud in the procurement of the agreement from appellant to dismiss her former suit having been proved, we are of opinion that the decree appealed from must be reversed, and this court will enter such decree as the court below should have entered, requiring W. G. Cline to further execute and deliver to appellant a good and sufficient deed conveying to her in fee-simple, as her sole and separate estate, the 92 acres of land, known in this record as the " Spratt " land, and he and J. M. Cline to pay the costs of this suit; and the cause will be remanded that the Circuit Court may make such further decree therein as may become necessary to carry into effect the decree of this court, or, if need be, to appoint a commissioner of the court for the purpose, to convey the " Spratt " land to appellant.

*Reversed.*