## WILLIAM E. GATES, BY JAMES D. KNIGHT, HIS GUARDIAN, v. GEORGE CORNETT.

*Contracts—Mental incompetency—Insanity—Equity—Burden of proof.*

1. The burden of proof is upon the complainant to show his mental incompetency when he seeks to set aside his contracts on that ground.

2. When a party deals with a man whom he knows to be of weak intellect, and the good faith of such dealings is challenged, he has the burden of proof to show that no undue advantage was taken.

3. The law throws its protecting shield around mentally incompetent persons, from whatever cause, and while, in some cases, it is permitted them to make contracts so long as they are not under the restraint of guardianship, these are binding only so far as they rest upon adequate considerations, and are free from fraud or overreaching.

4. Distinctions have been recognized between cases of insanity and mere weakness of intellect or imbecility. Contracts made with insane persons have pretty generally been held void, and those made with the latter class, voidable merely.

5. Contracts which are voidable because of the weakness of intellect of a party can be enforced or repudiated in a court of equity upon equitable grounds. If they have been executed by one party, and are executory upon the part of the imbecile, they can only be set aside at his instance by his doing equity.

Appeal from Jackson. (Gridley, J.) Argued June 12, 1888. Decided November 28, 1888.

Bill to set aside mortgages on the ground of the alleged mental incompetency of the mortgagor. Defendant appeals. Decree reversed, and one entered for complainant in accordance with the opinion. The facts are stated in the opinion,

*Thomas A. Wilson,* for complainant, contended:

1. Gates was an imbecile and mentally incompetent to manage his affairs at the time of the transaction involved in this suit. "No man supposed to be of sound mind would have been made such a mere puppet in dealing with his interests;" citing *McDaniel. v. McCoy*, 68 Mich. 340.

2. A man may be capable of transacting some kinds of business, yet if incapable of transacting the particular business in hand, or that the nature of his property requires, he is held to be incompetent and of unsound mind; citing *Surley v. Sater*, 27 N. W. Rep. 262.

3. In determining as to his capacity to make a civil contract, the law will look rather at his substantial business acts than to his conversation, or occasional doings not connected with business; citing Buswell, Insanity, 227.

4. Evidence of improvident bargains and squandering a large fortune, taken in connection with particular acts of folly, connected with the management or disposition of his property, is competent; citing Buswell, Insanity, 227; *Hall v. Hall*, 17 Pick. 373.

5. It was competent to consider Gates' appearance in determining as to his mental condition; citing Buswell, Insanity, 229; *Daniel v. Daniel*, 39 Penn. St. 191.

6. The declaration of a party is evidence of his mental condition, whether made before or after the transaction; citing Buswell, Insanity, 231, 333, 245, 246; *Conely v. McDonald*, 40 Mich. 150; *Bates v. Bates*, 27 Iowa, 110; and the nature of the act itself may be considered as evidence of want of capacity; citing Buswell, Insanity, 239, 241.

7. Opinions of persons acquainted with the party are competent evidence as to his mental condition; citing Buswell, Insanity, 253; *Beaubien v. Cicotte*, 12 Mich. 459; and opinions may be founded upon a knowledge of the conversations and business transactions of a person, and are admissible; citing Buswell, Insanity, 255.

8. Cornett, when dealing with complainant, knew of his mental condition, and a contract cannot be made with an imbecile, except, possibly, for necessaries; citing *Mason v. Dunbar*, 43 Mich. 410.

9. When weakness of mind is shown, the burden is upon the defendant to show fairness· of dealing; citing *Duncombe v. Richards*, 46 Mich. 166.

10. All that is necessary is such knowledge or circumstances as would put a prudent man upon inquiry; citing Buswell, Insanity, 301, 307; *Surley v. Sater*, 27 N. W. Rep. 262; *Bedford v.*

*Penny,* 58 Mich. 424; *Jackson v. King,* 4 Cow. 207; *Crawford v. Scovell,* 94 Penn. St. 48; *Fay v. Burditt,* 81 Ind. 433; *Lincoln v. Buckmaster,* 32 Vt. 652.

11. Cornett is not entitled to enforce the notes, having taken them with notice of Gates' incapacity, or that he was being defrauded; citing *Surley v. Sater,* 27 N. W. Rep. 262; *Thallhimer v. Brinckerhoff,* 3 Cow. 623; *Jackson v. King,* 4 Id. 207; *Fay v. Burditt,* 81 Ind. 433; *Crawford v. Scovell,* 94 Penn. St. 48; *Crane v. Conklin,* Saxt. Ch. (N. J.) 346; *Woodfolk v. Blount,* 3 Hayw. (Tenn.) 147; *Hough v. Dickinson,* 58 Mich. 89.

12. Weakness of mind, though short of imbecility or mental incompetency, will be considered when fraud is charged; citing *Seeley v. Price,* 14 Mich. 546; *Wartemberg v. Spiegel,* 31 Id. 402; *Jackson v. King,* 4 Cow. 207; *Owings' Case,* 17 Am. Dec. 326; *Crane v. Conklin,* Saxt. Ch. 346; *Juzan v. Toulmin,* 9 Ala. 602.

13. It is not necessary to put the parties *in statu quo,* Cornett not having acted in good faith; citing Buswell, Insanity, 40, 416; nor is it necessary to return the consideration when the defendant had notice of the fraud, or the money has been squandered; citing *Machine Co. v. Barnard,* 43 Mich. 379; *Crawford v. Scovell,* 94 Penn. St. 48; *Churchill v. Scott,* 65 Mich. 485.

*Marston, Cowles & Jerome,* for defendant, contended that complainant had not made a case, and their brief is confined to a discussion of the testimony.

CHAMPLIN, J. The bill in this case was filed to set aside six real-estate mortgages and a chattel mortgage, aggregating $15,839.82.

It alleges that Gates has from his birth been a simple and weak-minded person, and since the death of his parents has been of unsound mind, foolish, idiotic, and mentally incompetent, and wholly unfit to have the care, charge, and management of his property, and utterly incapable of understanding the effect of bargains, or the adequacy or reasonableness of the considerations therefor; that he is, and has been during said time, incapable of forming an intelligent judgment of the value of services or property, and would pay whatever any person with

whom he might chance to deal insist upon, without the slightest regard to the value of the same, or whether such services or property would be of the slightest value to him, and during all said time has been incapable of doing any kind of business in consequence of such mental deficiency.

That the defendant and certain other covetous, dishonest, and evil-disposed persons, well knowing the premises and Gates' mental condition, took advantage of his mental condition and infirmity to cheat and defraud him out of his property and estate; that defendant pretended to be a friend of Gates, and advised him in and about his business, but that such pretenses were deceitful, and were made for the purpose of more readily cheating and defrauding him out of his property by reason of said fraudulent notes, bonds, and mortgages; that said mortgages were obtained without any consideration, or, if there was a consideration, it was of trifling value; that the same were made and executed because the defendant required them, and induced Gates to believe that it was right and proper to make them, and that they were not the voluntary act of Gates; that, if any money was paid or loaned to Gates by defendant as part consideration for said mortgages, defendant knew the same would be of no use or value to complainant, Gates, and would be obtained by the person defrauding him.

That defendant claims that the consideration for such mortgages was largely and almost entirely notes of Gates, purchased by him from various persons; that such notes were fraudulent and void; that defendant did not purchase them in good faith, but knew their fraudulent charter, as well as Gates' mental infirmity and incompetency; that such notes were largely if not entirely without consideration; that there was an understanding between Cornett and the various persons who procured the notes

that such persons should obtain the same, and that Cornett would pretend to, or actually, purchase the said notes, with the view of obtaining said mortgages from Gates; that there was an understanding and conspiracy between said defendant and those persons taking said notes from Gates to cheat and defraud said Gates of his entire property and estate; that all the real-estate mortgages contained a clause permitting the mortgagee to declare the principal and interest due upon 30 days' default in payment of interest; that the chattel mortgage was made payable before the interest would become due upon said real-estate mortgages, and included all of complainant's personal property, leaving him without means of paying such interest, with the intent thereby to render the payment of such interest impossible, and enable the defendant to foreclose said real-estate mortgages for the full value thereof; that by such dishonest practices of defendant and others acting in concert with him, Gates' property has become greatly reduced, and, if said pretended mortgages are allowed to stand and be enforced against complainant, he will be deprived of nearly, if not quite, all of his property, and be reduced to absolute poverty; that Gates was the owner and in possession of the property mortgaged.

The relief prayed for is that the mortgages, notes and bonds thereby secured, and other notes, be set aside, and said mortgages discharged of record, and that defendant be enjoined from enforcing them, and for general relief.

To this bill the defendant answered, neither admitting nor denying that the complainant was from his birth simple and weak-minded, but he denies that Gates, since the death of his parents, has been of unsound mind, foolish, idiotic, and mentally incompetent, as stated in said bill; avers that he has been, and still is, of sound mind, and competent to transact business, and to have

the care and management of his property and estate; that, in all his business transactions between him and complainant, Gates showed and exercised ordinary intelligence in the same, and he (Cornett) had no reason to believe, and did not believe, and does not now believe, him to have been or to be incompetent; that he was perfectly capable of comprehending bargains and the reasonableness of considerations, and to transact business properly and successfully.

He admits the making and execution of the several mortgages set out in the bill, and says the one dated August 21, 1884, was for $2,000 money loaned at that time by him to Gates; that the consideration for the other mortgages was partly money loaned and partly for notes, which he had purchased, against Gates, at his request, and for his accommodation, and upon the promise that security should be given therefor. Denies having taken any advantage whatever of Gates, and denies all fraud, conspiracy, and evil-doing charged against him in the bill fully and particularly.

A large amount of proof was taken by testimony given in open court, and relief was granted to complainant nearly to the extent prayed for in his bill.

The court found as a fact, which is stated in the decree, that the complainant received from his parents an estate of upwards of $60,000; that he was then and ever since has continued to be mentally unsound, and incompetent to have the care and management of the same, and was defrauded of a considerable portion thereof by the defendant and certain other persons acting in concert with him; that the defendant, when he obtained the said notes and securities mentioned in the bill of complaint, and in all his dealings in reference thereto, had full knowledge of the incompetency of said complainant, and that he was so being defrauded of his property; that said obliga-

tions and securities were obtained by the defendant for the express purpose of defrauding the complainant, and are without consideration, or, if any was paid, it was of inconsiderable or no benefit to Gates, by reason of the fraudulent schemes and conduct to defraud him of his property, to which the defendant was a party, and of which he had full knowledge, except some small sums amounting in the aggregate to the sum of $510; that the securities were fraudulent and void.

And it was decreed that each and all of the mortgages executed by Gates to Cornett, mentioned in the bill of complaint, including the chattel mortgage of $1,900, be set aside and held to be of no force or effect, except the mortgage executed January 5, 1884, for the sum of $1,306.-29, which mortgage was held to be a valid and subsisting lien for the sum of $510, with interest thereon from the date of said mortgage, being the sum of $104; making in all $614.

There is much testimony in the record of the opinions of witnesses as to the competency and incompetency of William E. Gates to transact business, but it is the conflict of opinion with opinion. The facts upon which such opinions are based lead us irresistibly to the conclusion that complainant is and has been always mentally incompetent to transact business, in the ordinary sense of that term. His mind is weak, and he lacks in judgment, and is incapable of forming an independent judgment of the value of services rendered by laborers, or of property. He is by no means an idiot. He attended the district school, and obtained a passable knowledge of arithmetic and penmanship. He could compute interest accurately, and, so long as his property remained in bonds and mortgages, he appears to have managed it without loss. During the life-time of his parents they deeded to him 80 acres of land. His father died in 1878, and his mother in 1879.

He was the only child and heir, and after his parents' death he had the exclusive care and management of the estate, which descended to him. He was appointed administrator of the estate left by his mother, and gave the proper bond, with two sureties.

The inventory of this estate showed property amounting to $41,772.96, consisting of both real and personal estate; but the great bulk of the estate consisted of bonds, notes, and mortgages bearing interest. He had some other property aside from this left to him by his father. The exact amount, I think, does not appear; but after his mother's death he kept his money out at interest at good rates, and generally secured by first mortgages. When payments were paid he made his own computation of interest, and was generally accurate. He assigned and discharged mortgages. The only thing that he could do well was to loan money and re-invest it upon safe security. This kind of business he could do as well as ordinary persons, and showed no want of capacity. He could transact business with honest people without detriment or loss to himself, but easily fell a prey to the vicious and designing. In 1881 he sold a farm for $17,000, taking a $11,000 mortgage to secure a part of the purchase price. No claim is made that he did not obtain the full value of his property. He kept books of account. His credit was good among those who knew him, and he borrowed money at the banks. No one doubted his honesty, or refused to deal with him on the ground that he was mentally incompetent to transact business.

On the other hand, his appearance indicated a person whose intellect was below mediocrity. He was slow of speech, talked but little, hesitated when asked a question, and was slow of comprehension. He paid George Cornett, the defendant, $75 an acre for 120 acres of land, which, from the testimony of several witnesses, was worth

not to exceed $55 an acre. He paid defendant's father $80 an acre for 100 acres, which the same witnesses valued at not to exceed $65 an acre. He paid George Cornett, the defendant, $300 for a horse, which was not worth to exceed $125. We have not overlooked the fact that defendant introduced testimony placing the value of the above property at nearly or quite to the figures which Gates paid, but we think the decided weight of testimony shows that Gates was overreached in these transactions with George Cornett. Of these particular transactions no complaint is made in the bill, and the facts are recited to show defendant's knowledge of Gates' incompetency to transact business.

He seems to have gotten along well enough while he was handling his bonds and mortgages, and until he conceived the idea that he wanted to carry on farming upon a large scale. At this time he owned between sixty and seventy thousand dollars in personal property. After selling a farm which he owned, in 1881, to William H. White, for $17,000, above referred to, he removed, in 1882, into another township, and bought several farms, aggregating over 521 acres, at a cost exceeding $39,000. He attempted to improve these farms, and in doing so lost the remaining portion of his property, and incumbered his land for about $15,000, and incurred a large amount of debts besides. He paid $1 a rod for ditching, some of which was sublet by the person taking the job at 60 cents a rod, and should not have cost more than 50 cents a rod. He paid $1 per stump for digging out stumps on his farm, which should not have cost more than 15 cents each. He paid 75 cents a rod for cutting the brush along the fences, which could have been done for from 5 to 15 cents a rod. He paid 15 cents a rod for filling in "hog holes" under his fences. A cent a rod would have been good pay. He loaned $3,000 on 60 acres of land that

Potter bought of Dancer on the same day for that amount of money, when he knew that was all Potter paid for it; and the next year bought the same land of Potter, and paid him $4,000 for it in the same condition it was in when Potter bought. He paid William H. Cornett, a brother of defendant, 90 cents a tree for trimming apple and other fruit trees, which was not worth to exceed 15 cents each. He let a contract to William H. Cornett to dig out fast stone at $3 each, and another to Edmunds at $1 each, and it did not cost them 50 cents a stone to do what they did.

Edmunds worked for Gates by the month, and at the same time took contracts to do jobs upon his farms, out of which, in a little over a year, he made over $600 net profit. One job was to fill "hog holes" under a fence 40 rods long, at 15 cents a rod, and it took him one hour and a half to do the job; and Gates did not seem to comprehend that he was being cheated by paying $6 for work performed by this boy (who was only 20 when he was sworn) in one hour and a half. He paid $1,120 for "bogging" a marsh, that is, for cutting and removing them, the labor of which did not cost more than $40. He also paid $620 for doing a similar piece of work on a marsh, which could have been done for $50. He paid Edmunds $15 for fixing his wind-mill, which he got done for $3. He made a contract with James Hitchcock and Frank Lammers to put up clothes-line posts. There were to be 15 posts, and they were to furnish the wire, chop the posts from Gates' timber, and set them in the ground three feet. They were to peel off the bark, and Gates was to haul them. Gates gave them his notes for the job. They cut the posts, and he hauled them, but they never dug the holes or set them. These notes he thinks were sold to Cornett.

In 1883 he got new eaves-troughs put on his barn for

9 cents a foot. In 1884 he paid Edmunds 18 cents a foot for repairing them, and measured them the whole length. He made a contract with William H. Cornett to pay him $3 a stone for taking out stone on his farm, which should not have cost more than 25 cents a stone. Charles Taylor, with a man and team, got out 80 of these stones in one day. Gates then paid 25 cents a hole for filling the holes with dirt where the stones were taken out. Five cents each would have been a large price. He paid $5 a rod for building a board fence, and he furnished the posts. . A proper price would have been $1.50 a rod. And again, he paid $2.40 a rod for building board fence, and $1.50 a rod additional for the lumber that was used; and he paid $2.50 a rod for setting the posts for another fence. He also paid $1.40 a rod for laying up a rail fence. Another job, he paid $1 a rod for laying up rail fence, and borrowed the money at the bank to pay for it. Fifteen cents a rod would have been sufficient pay for any of this work.

He paid $40 for one gate, and $30 for another, and 18 others at $5 a piece; and the most of them are still lying around unused. He then paid $1 a gate for having the posts painted. He paid five cents a piece for splitting fence posts, and $5.50 a hundred for splitting rails, when $1 a hundred would have been a good price in either case. He paid Leverett Adams $300 for moving 40 rods of stone row, or at the rate of $7.50 a rod, worth not to exceed $50. He paid Lyons $3.50 a rod for laying up stone wall; worth $1.50 a rod to perform the work. He paid Adams $2.50 a rod for hauling stone for a wall, and, after it was laid, paid him $2.50 a rod for hauling away what stone there was left. He gave defendant a mortgage of $1,109 on his home farm as pay, several weeks in advance, for Cornett's brother and one Delos Cornwall in moving about 200 rods of stone, when $250 would have been a

fair compensation, and, although he had paid for it once, he also paid Cornwall $400 as his share of the work before the work had been commenced, upon Cornett's order, and, as Gates claims, Cornett never allowed this order when he came to settle with him. He also says that the work was done in two or three weeks, and yet saw nothing wrong about it. He paid Benjamin Morris $1,800 for laying tile on about 10 acres of marsh, and it was done by five or six men in about three weeks. He then paid Frank Edmunds 50 cents a rod for filling the dirt back into the ditches.

This enumeration has already become tedious, and the subject is far from being exhausted. It may be summed up in saying that Gates was surrounded by a lot of unscrupulous men, who took advantage of his incompetency to transact business, who expedited his work of farm improvements by taking "star contracts" for every imaginable purpose, and when they had drained his purse of all his ready money, they called for and he gave them his notes of hand, at first payable in 30, 60, and 90 days, but later on upon 1 day's time, until he had incurred an indebtedness of over $15,000. And these notes defendant bought, and, when he had accumulated any considerable sum, he called upon Gates, and he would give a new note for the aggregate amount, and secure its payment by mortgage, and the original notes would then be destroyed, so that their identity is lost. These contracts were fraudulent, and the notes given therefor were obtained from Gates through imposition, and were void in the hands of the original holders, because of the fraud and imposition practiced upon Gates in obtaining them.

The testimony leaves no room for doubt that defendant well knew of Gates' infirmity, and that he was mentally incompetent to transact business in a safe or prudent manner for his own interests. He had known him from

boyhood; had attended the same school; had lived in the same neighborhood. He had sold him a farm at an exorbitant price, and afterwards he sold the farm of his father to Gates at an exceedingly large price. His brother, William, did likewise. He saw the improvements that were being made upon the farms so purchased. He worked for Gates himself in building board fences. His brother, William, was one of the "contractors" who defrauded Gates, and who, it appears from defendant's testimony, informed him of Gates' critical financial condition, which induced him to take the last real-estate and chattel mortgages, and caused him to refuse to purchase any more notes.    In 1880 or 1881, in presence of B. C. Hatch, Jr., he animadverted upon the act of Gates' father in leaving his property to a fool, and said that Gates did not know anything.    In 1882 or 1883, while these improvements were going on, he asked James Sandford, a neighbor of Gates, how he (Gates) was running his business. Sandford told him that he did not know how Gates was running his business, but he saw he had plenty of help going back and forth past his house, and remarked to Mr. Cornett that he must be spending considerable money to keep things running in that way; and defendant replied that he—

"Supposed he had a large green bay tree loaded with mortgages, and occasionally, when he got out of money, he would pick one off, and go down and negotiate it and sell it; get the money for it to use in his business; he was making some good improvements there."

William Bishop met defendant at William Cornett's house in 1884, at the time William had a contract for getting out fast stones on Gates' land, and the subject of the way in which Gates was managing his farm came up, and George Cornett said that Gates was drawing stone from an inside fence for the purpose of outside fences,

and was gutting the farm, and drawing them along outside of the road. Bishop asked if he was going to wall himself in, and Cornett said he did not know but what he was, and said that he was a ———— fool.

It appears from the testimony of Homer Frazer that during the time defendant was purchasing the notes given by Gates he told Frazer that he "bought notes of those fellows up there, and when he got enough of them he took mortgages;" that he gave Gates all the time he wanted at 8 per cent. interest. He also said that he could manage Gates as well as any one. The defendant, in his testimony, denies this statement, and says that Frazer wanted that he should try and sell the McKenzie farm to Gates, as he thought defendant had considerable influence with Gates, and could "work" him.

If Frazer's statement is true, defendant expressed his ability to manage Gates to suit his purposes. If, on the contrary, defendant's statement is correct, it shows that there was a belief in Frazer's mind that defendant could influence Gates' conduct in business matters; and we are satisfied from all the testimony that such was the fact, and that he exerted such influence to the prejudice of Gates in his dealings with him. It satisfactorily appears from the testimony that defendant knew of the mental incapacity of Gates. He knew that Gates was liable to be overreached in his business transactions. He knew what improvements Gates was making. He must have known that many of them were extravagant, and not such as prudent husbandry required. He was present at his brother William H. Cornett's house when William H. and Gates were figuring up the contract for the removal of fast stone, which was one of the greatest swindles perpetrated upon Gates by any of the contractors.

Defendant knew that Gates was calling for and using

large amounts of money, such as indicated great extrava-
gance, if he was not being cheated. Gates was a man
of reputed wealth, and defendant regarded him as wealthy,
and that he had only to convert some of his mortgage
securities to enable him to pay for the improvements he
was making. When a man of such weak intellect sud-
denly turns from an investor to a borrower, and gives his
notes for current expenses in carrying on and improving
his farm, and borrows such large and frequent sums of
money as defendant claims he did of him, it challenges
credulity to believe that a person knowing him and deal-
ing with him as defendant did, could close his eyes to
the existence of the facts, and say that he was unaware
of any advantage being taken of Gates by the numerous
contractors, or that he was not a sharer in the plunder
secured. That he had the unbounded confidence of
Gates is manifest from the fact that Gates went to him
for counsel, advice, and assistance when it was rumored
that steps were to be taken for the appointment of a
guardian over him. He assisted in opposing such
appointment, and later was active in efforts to remove
such guardian.

The extent of defendant's influence over Gates is shown
by the latter's testimony, wherein he states that certain
notes were reckoned in against him twice in his settle-
ments with defendant, and others were raised,—one from
$60 to $600,—by whom he does not know, but he suffered
defendant to figure them in at their raised amount, and
said nothing about it to defendant, because he was afraid,
and did not want to have any trouble with defendant.

The burden of proof was upon the complainant to show
mental incompetency, and we think it has been made
out. When a party deals with a man whom he knows to
be of weak intellect, and the good faith of such dealings

is challenged, the burden of proof is with the party who has dealt with the weak-minded person to show that no undue advantage was taken. The law throws its protecting shield around mentally incompetent persons, from whatever cause, and while, in some cases, it is permitted them to make contracts so long as they are not under the restraint of guardianship, these are binding only so far as they rest upon adequate considerations, and are free from fraud or overreaching.

Distinctions have been recognized between cases of insanity and mere weakness of intellect or imbecility. Contracts made with insane persons have pretty generally been held void, and the latter voidable merely. Gates' case falls within the last category. His contracts were not absolutely void. To so hold would be to unsettle titles, and overthrow a long series of business transactions in which complainant was engaged during eight years, without securing any benefit to Gates, and to the detriment of a great many persons who dealt with him in the utmost good faith, and without cheating him. Belonging, as his contracts do, to that class which are termed "voidable," they can be enforced or repudiated in a court of equity upon equitable grounds. Where the contracts have been executed by one party, and are executory upon the part of the imbecile, they can only be set aside at his instance by his doing equity. The maxim applies here, that he who asks equity must do equity.

The defendant is entitled to no greater consideration than the parties were from whom he purchased notes. Some consideration entered into these notes which was beneficial to complainant, Gates. Stones were removed from his fields, fences built, marshes cleared and drained, other improvements were made, and the value of his farm enhanced. Lands, which complainant's witnesses valued,

before these improvements were made, at from $60 to $65 an. acre, .were shown, after the improvements were made, to be worth from $90 to $100 an acre. It would not be equitable or just to permit complainant to retain the entire benefit of these improvements, and at the same time deprive defendant of the money he invested in these notes at the request of the complainant, to enable him to make them. There is no testimony in the case showing that defendant advised Gates to enter into these contracts, or to make these improvements. In the present case equity will be done by complainant paying defendant what the benefit to his farm has been by enhancing its value in making the improvements. The testimony is not as clear and definite upon this point as we could wish. If we fail, through insufficiency of testimony, to allow defendant as much as we ought, it will be owing to his own fault in not furnishing the proof.

It was suggested upon the argument that, if the testimony was not sufficiently definite upon this subject, a reference should be ordered to take further proofs. The record is already voluminous, covering over 1,300 printed pages, and we shall not order a reference, but shall arrive at the best conclusion we can from the testimony before us, and, without referring to particular portions, merely state the result of our investigation and consideration.

We think the benefits received by the complainant on account of the improvements represented by the notes and mortgages set up in the bill of complaint, including the money loaned by defendant to complainant to pay taxes, are equivalent to the note and mortgage dated December 18, 1884, namely $5,534.82, and this mortgage may stand as a valid security for that amount, but to draw interest only at the rate of 6 per cent., the now legal rate of interest, from date. The other notes and mortgages set forth and described in the bill are declared null and void,

the notes to be surrendered up to be canceled, and the mortgages to be discharged of record. The mortgage of $5,534.82 will be discharged by defendant on payment, with interest at 6 per cent., which may be done at any time at or before maturity. But no proceedings shall be taken to foreclose said mortgage within 90 days after the transcript in this cause is remitted to the court below. Complainant to recover his costs of both courts, to be taxed.

The decree of the circuit court will be reversed, and a new decree entered here in accordance with this opinion.

MORSE, CAMPBELL, and LONG, JJ., concurred with CHAMPLIN, J.

SHERWOOD, C. J. This case presents a most unconscionable state of facts,—a system of fraud practiced upon this incompetent and almost imbecile complainant, deserving of the severest condemnation. It is a hard state of things indeed when the law must be so construed as not to protect the weak and unfortunate, whether in capacity or fortune, from the avarice, rapacity, and fraud of designing and unconscionable men.

I am not able wholly to agree with what my Brother CHAMPLIN has written in this young man's case. I think the record shows him entirely incompetent to have the care and management of his property, or to transact business relating thereto, and his contracts should be held void. I know of no law requiring us, or any other court, to create or direct the enforcement of a contract made in the interest of a claimant through the frauds he has committed in dealing with such an incompetent, and it seems to me that this is precisely what we do when we recognize the claims made by the defendant, and decree a lien in his favor securing the same against the property of this incompetent.

This is not a case where the person dealing with the incompetent did so in good faith, nor does it appear that the dealings had with him were necessary, or for his benefit. I think the notes and mortgages should be declared void, and be delivered up to be canceled.