## Richmond.

## M. A. LONG, SUING BY LEE LONG, HIS FATHER AND NEXT FRIEND, *v.* WILLIAM C. HARRISON AND D. B. HARRISON.

### November 16, 1922.

1. JUDGMENTS AND DECREES—*Suit to Enjoin Judgment—Fraud and Undue Influence in Procuring the Obligations and Judgments upon them—Mental Capacity of Judgment Debtor—Case at Bar.*—The instant case was a suit to rescind and enjoin the collection of nine judgments against the complainant. One of these judgments was confessed and the others obtained by default. It appeared that complainant was born deficient mentally, a "moron." Although complainant was physically robust he was incapable of concentrated thought for any length of time and was easily influenced by others. Complainant showed great business incapacity, recklessly drawing checks upon banks with which he had no deposits, and showing no concern as to their payment or the payment of other obligations entered into by him. A preponderance of the evidence showed that defendants knew of complainant's lack of capacity prior to the time that the notes were given upon which the judgments were entered and had formed a design to possess themselves of his whole estate by means of the use of undue influence upon him, which they knew could be exerted because of his deficient mentality. The notes were unsupported by adequate consideration.

   *Held:* Upon this and other evidence as to the mental deficiency of complainant and the dealings of defendants with him, that the judgments and the notes upon which they were entered were obtained by fraud by the use of undue influence upon complainant exerted by defendants.

2. CONTRACTS—*Mental Incapacity—Fraud.*—Although weakness of intellect, short of insanity, in one of the contracting parties, is no ground *per se* for invalidating a contract, it may have that effect if additional facts, betraying an intention to overreach, can be proved.

3. CONTRACTS—*Consideration—Inadequate Consideration—Rescission.*—In general, mere inadequacy of consideration uncombined with other circumstances does not afford sufficient ground for the rescission of a contract, or the cancellation of a written instrument. A contract

will be set aside for inadequacy of consideration only when a consideration is so grossly inadequate as to shock the conscience and then a court of equity interferes because under such circumstances it constitutes satisfactory evidence of fraud or undue influence. But this does not mean that inadequacy of consideration is not an important factor in determining the validity of a contract. It, in connection with other circumstances, may well be evidence of fraud or undue influence.

4. CONTRACTS—*Rescission—Mental Incapacity.*—While a contract made by a person of fair understanding should not be set aside merely because it was rash, or improvident, or a hard bargain, yet if made with a person of impaired mind or feeble intelligence, the inference is that it was obtained by imposition, deception or undue influence, so as to cast upon the other party the burden of showing its fairness. A court of equity will see to it that a bargain made with a party of weak intellect shall be fair.

5. FRAUD AND DECEIT—*Proof of Fraud—Circumstantial Evidence.*—It is not necessary to prove fraud by direct and positive evidence. Circumstantial evidence is not only sufficient, but in most cases is the only proof that can be adduced. A transaction may of itself and by itself furnish the most satisfactory proof of fraud, so conclusive as to outweigh the answer of the defendant and even the evidence of witnesses.

6. CONTRACTS—*Mental Incapacity—Undue Influence—Case at Bar.*—In the instant case the complainant was not incapable of making any valid contract. He was capable of making simple contracts and of arriving at reasonable conclusions from uncomplicated facts, where his mind was not influenced to the contrary by the suggestions of others. But his weakness was that he was abnormally subject to the influence of any one who chose to exert it in order to dominate and direct his mind in any business matter, and defendants having taken advantage of his weakness to obtain from him notes without adequate consideration and judgments upon the notes by confession and default the collection of the judgments should be enjoined.

7. CONTRACTS—*Mental Incapacity—Undue Influence—Service as Juror— Case at Bar.*—In the instant case the facts that complainant, suing to enjoin judgments as having been obtained by fraud and undue influence, was married, and had been entrusted by his father with the control of valuable property, and had served as juror were not inconsistent with the fact that the complainant in his business dealings was "but wax when in the hands of designing men."

8. JUDGMENTS AND DECREES—*Fraud and Deceit—Suit to Enjoin Judgments— Failure of Complainant Suing as Next Friend for his Son to Call his Son and the Wife of the Son.*—In the instant case a suit by the father as next friend of his son, who was mentally deficient, to enjoin the collection of judgments on the ground that they were obtained by fraud and undue influence, the failure of the father to take the deposi-

tions of his son or of his son's wife did not affect the case in view of the fact of the known propensity of the son to fabricate and his vanity and unconsciousness of his own defects, and the probability that he would consider the testimony of his wife as hostile to him.

9. RESCISSION, CANCELLATION AND REFORMATION—*Restitution—Decree of Reference to Determine Amount of Restitution Upon Rescission of Contract—Case at Bar.*—In the instant case a suit to rescind and enjoin judgments obtained by fraud and undue influence the trial court entered a decree for defendants. Upon reversing this decree and remanding the suit to the lower court the Supreme Court of Appeals directed that a decree of reference be entered to determine the measure of restitution which complainant should make to the defendants upon the rescission of the judgments and obligations upon which the judgments were founded.

10. RESCISSION, CANCELLATION AND REFORMATION—*Restitution—Return of Consideration Upon Rescission of Contract—Fraud or Undue Influence.*— It is well settled that, even where a contract is set aside for fraud in its procurement, the party at whose suit the rescission is granted must return whatever value he has received under the contract; but where by the acts of the adversary party complete restoration is rendered impossible, rescission will not thereby be defeated. That is to say, where a note, or judgment thereon, is rescinded for fraud, the maker of the note must, so far as the acts of the payee leave it practicable, account for the benefit he has received in the transaction. This rule applies to a contract set aside on the ground of undue influence upon the complainant, a person of weak mind.

11. RESCISSION, CANCELLATION AND REFORMATION—*Restitution—Decree of Reference to Determine Amount of Restitution upon Rescission of Contract—Burden of Proof.*—Upon a reference to a master, where there is a decree of rescission, to determine the consideration received by the complainant on the contract rescinded, defendant should bear the burden of proof as to the actual consideration which was furnished to complainant under the contract.

Appeal from a decree of the Circuit Court of Rockingham county. · Decree for defendant. Complainant appeals.

*Reversed and remanded.*

The object of this suit is to rescind and enjoin the collection of nine judgments obtained on notices of motions therefor by the defendants, William C. Harrison and D. B. Harrison, against M. A. Long, during the

years 1915 and 1916—one of the judgments having been confessed by the latter in the clerk's office and the other judgments having been obtained by default—aggregating approximately $23,000.00 of principal, together with interest and costs to be added, the principal being evidenced by thirty-nine negotiable notes executed by M. A. Long, only one of which (for $5,740.30 subject to a credit of $175.00) was payable to the order of W. C. Harrison (one of said defendants), six of the residue being payable to the order of D. B. Harrison (the other defendant), and the remainder thereof being payable to one W. K. Neff, or to one D. A. Taylor, or to a firm of Sellers & Taylor, of which D. A. Taylor was a partner; which notes were assigned by such payees to the one or the other of said defendants.

The ground on which the injunction is sought, as appears from the amended bill filed in the cause, is that the said judgments and the notes on which they were based, were obtained by the defendants by fraud, by means of the use of undue influence over the said M. A. Long exerted directly by the defendants and also in conspiracy with and assisted by the said Neff and Taylor. That the fraudulent result aforesaid was accomplished because of the fact that the said M. A. Long was of such weak and feeble intellect and will that he was incapable of understanding the nature and effect of his acts and dealings with the said Harrisons and Taylor and Neff and was unable to resist the dominating influence which they had obtained over him and utilized for the accomplishment of their fraudulent schemes, so that he was an easy prey and victim to the craft and cunning of the said Harrisons, Taylor and Neff, and was also incapable, when under such influence, and because of said weak understanding, of conducting the most simple and ordinary business or of bringing an intelligent judgment and

understanding to bear on the matters in which he was engaged and utterly and wholly incapable of executing a valid note under such circumstances. That said Harrisons, Taylor and Neff, knowing at the time and taking advantage of said mental incapacity and feebleness of will of the said M. A. Long, obtained his signature to said notes, many of which, it is alleged, were for wholly inadequate consideration. That such signatures were procured by the false and fraudulent representations to said M. A. Long by said Harrisons, Taylor and Neff (together with other fraudulent devices), that said notes were for *bona fide* indebtedness to them, when in truth and in fact no such indebtedness existed. That, as to those of said notes which were made payable to said Neff and to said Taylor and also to Sellers and Taylor, they were, prior to the rendition of the judgments thereon, in pursuance of said fraudulent conspiracy and as a part thereof, assigned by said Neff and Taylor to said Harrisons, who, as it is also alleged, paid either no or a mere nominal consideration, and took the same with full knowledge of the facts invalidating them. And that the confession aforesaid of one of said judgments by said M. A. Long and his failure to defend the other actions in which the remainder of the judgments were obtained by default as aforesaid, were alike due to the fact that, because of his weakness of intellect and incapacity and undue influence aforesaid, he did not understand the nature, purpose and effect of said judgments or of the notices of motions therefor.

There are other allegations in the amended bill, which need not be referred to here, of specific facts upon which the aforesaid general allegations of fraud are based.

The defendants filed their separate answers in which they denied and put in issue all of the allegations of the bill above alluded to touching the incompetency of M. A. Long and imputing improper conduct to them.

The depositions of a great number of witnesses were taken and filed for the complainant and defendants, including the depositions of the father of M. A. Long and of both defendants, and also of said Taylor and Neff, the printed record before us consisting of over a thousand pages, the volume of the depositions rendering it impractical to refer to the evidence in detail.

There are, however, certain facts clearly established by the evidence which may be stated as follows:

M. A. Long was born deficient mentally, a "moron," (a word derived from a Greek word meaning "fool"). He was an imbecile or an idiot in some degree, at birth. This defect was hereditary. He was abnormally large at birth, had to be removed from his mother's womb by the use of instruments, was delayed in walking, slow in talking, was a nervous, emotional child, was extremely backward at school and made no intellectual progress at various institutions of learning to which he was sent. However, when he arrived at the years of manhood and when he had the business dealings which are the subject of controversy in this suit, he was robust and manly in physical appearance, and as the result of home and school training and intercourse with others, he attained the faculty of a pleasant address in his contact with others, being as a rule jovial and markedly fond of laughing and joking; but he was at no time capable of serious or concentrated thought for any length of time on any subject. He was born in 1890, became twenty-one years of age in 1911 and married in 1913, when twenty-three years of age, and has two children by the marriage. But as boy and man he has exhibited certain marked characteristics; being extremely nervous and emotional, having irrational spells of violent temper; addicted to fabrications in his statements, being reckless in his disregard of truth and having an exaggerated idea of

his own business capacity and ability. After reaching manhood and during the period of his business dealings aforesaid, he gave his checks promiscuously on banks with no money on deposit to meet them and notes of hand in great numbers without regard to his ability to meet them, and without any effort to create any credit balances in bank to meet them and without any concern whatever as to the results of their non-payment.

On account of his mental deficiencies the father despaired of the son ever making any business success of his life, but being a large landowner and engaged in farming on an extensive scale, principally in Page county, where he then resided, the father made every effort to interest the son in farming and gave him all the training he could in that occupation during the minority of the boy. The latter developed little aptitude for that business but he was fond of out-door life and the father, after much anxious thought on the subject and being urged by the grandmother of the boy so to do, and being unable to devise any better plan to enable the son to live his life, with some misgiving, in the spring of 1912, when the boy was between twenty-one and twenty-two years of age, put him in charge of a farm in Rockingham county, about twenty miles distant from the father's home, and in the same neighborhood in which the defendants lived, with an overseer on the farm in whom the father had confidence. The farm is quite a large one, containing some 600 acres, but with most of the land unfit for use, only about 200 acres of it being suitable for farming purposes and that rather poor land for that section of the State. The place was not capable of carrying over thirty or forty head of cattle through the winter and the cattle and farming operations which could be carried on upon the farm itself were therefore limited to a comparatively small scale.

The father accordingly properly stocked the farm at a cost of about $2,500.00 and the son took up his residence there in the spring of 1912 and began farming operations.    Between that time and July, 1916, the father put other stock on the farm aggregating a further outlay of several thousand dollars.

The farm, at the time last mentioned, in truth belonged to the son, being inherited from his mother, who was then dead, but it was subject to the life estate of the father by curtesy.    The son at that time owned no other property than the estate in remainder in such farm.    But in July, 1912, the father, in contemplation of a second marriage, executed and recorded a deed conveying estates in remainder to his three sons (the oldest of whom was the said M. A. Long), in certain real estate theretofore belonging to the father, reserving, however, a life estate for himself therein.    Thereupon the said M. A. Long became the owner of a vested estate in remainder, after the life estate of his father, in real estate which, including the said farm inherited from his mother, it is estimated by the testimony in the cause will be worth some $30,000.00 in value upon the death of the father.    It is this estate of M. A. Long in remainder which is bound by the liens of the aforesaid judgments as they appear of record and to subject which to such liens the defendants had brought suit at the time the instant cause was instituted.

The transactions of the defendants with M. A. Long began in June, 1912, and they continued from that time until July 1, 1916, a period of about four years.    These transactions, as testified to by the defendants and Taylor and Neff, consisted almost entirely in cattle and horse trades and purchases, only small amounts of money loaned to M. A. Long at times being claimed to have been included in the judgments; and in this short

time M. A. Long became indebted to the defendants in the aggregate of $23,000.00 and paid to them in addition thereto about $2,000.00 in money, as appears from his cancelled checks to them produced in evidence, which were found when evidence was being sought by the father for use in this suit. · There were also a great number of cancelled negotiable notes of M. A. Long also found at the same time, aggregating some $4,000.00, payable to the order of one or the other of the defendants, or to Neff, or Taylor, or to Sellers and Taylor, endorsed by the payees, of many of which the defendants and Neff and Taylor do not give any account in their depositions and say that they do not know whether they were covered by the notes on which the judgments aforesaid were obtained or not; and the farm, on which M. A. Long was during the aforesaid period, was, during the said four years practically stripped of all stock of any value by his dealings, the bulk of which were with the defendants and Neff and Taylor. Moreover, the testimony of the defendants themselves shows that many of the notes on which said judgments were entered were given by young Long to cover other numerous notes of his, together with balances supposed to have been due by him on various transactions, at frequent intervals, which has created a confusion of transactions with each other so abnormal as of itself to be almost sufficient to raise the presumption of fraud on the part of intelligent men, such as were the defendants, doing business in such a way.

There is practically no conflict in the evidence showing the above stated facts. With respect to the facts which will now be stated there is conflict in the evidence, but we shall state them as we consider them clearly and convincingly established by the preponderance of the evidence.

When and after M. A. Long attained the years of
manhood and during his aforesaid dealings with the de-
fendants, and afterwards, he exhibited practically the
same characteristics aforesaid which he exhibited there-
tofore. Further, he had no capacity to consider or
weigh the real or market value of things he might want
to acquire or wish to dispose of at any time, or to act
with a view to protect his own interest at such times, if
anyone chose to urge him to any particular course of ac-
tion, being readily and easily influenced by anyone, with
whom he might be, to sell or to buy anything at the sug-
gestion that he should do so, at any price offered or
asked, however large or small, respectively. If urged
to do so, he would give his checks or notes of hand, re-
gardless of the value secured or promised therefor, being
as ready to sign a note for $5,000.00 as for $500.00 or
$5.00 in the same transaction. He had no reliable
memory of any past transactions, unless of a humorous
nature and of simple occurrences associated with some-
thing laughable. And all this without any conscious-
ness or appreciation on his part of his mental deficien-
cies.

Moreover the decided preponderance of the evidence
clearly warrants the inference that both of the defend-
ants soon after they began business dealings with M. A.
Long, and prior to the time the notes were given on
which said judgments were entered, knew of his charac-
teristics, stated in the next preceding paragraph, and
formed the design to possess themselves of the whole es-
tate of the young man by means of the use of undue in-
fluence upon him, which they knew could be exerted be-
cause of his aforesaid deficient mentality, and this, the
preponderance of the evidence clearly shows, was ac-
complished in part at least by the defendants, either
directly or indirectly in conspiracy with the aforesaid

28

Neff and Taylor, by obtaining the notes upon which the judgments were rendered, the aggregate of which was unsupported by any adequate consideration shown by any satisfactory evidence in the record; and by obtaining the judgments by confession and default by the use of the same undue influence.

On the subject of the competency of M. A. Long the defendant, Wm. C. Harrison himself, in his deposition testified as follows:

"293-Q. About eighteen months ago didn't Mr. Lee Long come to your house with his son Mike Long and, in discussing the matter with you, say that he wanted to investigate this suit?

"A. Yes, sir.

"294-Q. That he was willing to pay every dollar of indebtedness that his son Mike owed, but he did not understand how he could owe $25,000.00 in three years and have nothing to show for it; that he had investigated the matter and his son was not extravagant? And didn't you say that the fact was that Mike Long was not competent to transact business? Didn't you make that statement to Mr. Lee Long?

"A. I said that it would seem that he wasn't.

"295-Q. You say now that you said 'It would seem that he wasn't?'

"A. That was the inference when we were talking. It would seem that a good business man—a very shrewd man—would not get that far behind.

"296-Q. The matter that Mr. Lee Long was pressing upon you was not that Mike was getting behind, but that he had no property to show and never had any property to show for it?

"A. He did not say that he never had any.

"297-Q. That he never had sufficient property to show for it?

"A. I did not understand that.

"298-Q. What did Mr. Lee Long say in that conversation as to that?

"A. I cannot recall it.

"299-Q. I want to know what your recollection is.

"A. He said that he was surprised at the condition Mike Long was in; that he was almost an imbecile; that is what he said.

"300-Q. You agreed with him and said that he never was competent to transact business?

"A. No, sir; I said it looked like he was not competent.    I told him that he had better get that boy away from down there."

Later this defendant resumed the witness stand at his own instance and attempted to explain away his testimony just quoted, but did not succeed in doing so in a convincing way.

Other references are made to the evidence in the opinion.

After considering the evidence the learned judge of the court below handed down the following opinion in writing, which was made a part of the decree under review:

"While it is clear from the evidence in this case that the plaintiff is to some extent mentally defective and weak-minded, the court does not consider it established that he is so far deficient in understanding as to be incapable of contracting or suing and being sued.   His marriage to an intelligent lady of good social standing, who and whose people knew him from childhood; the manner in which he has been entrusted by his father with the control of valuable property, both real and personal; his service as a juror without the discovery by his associates on the jury, or by the court or by counsel in the cases, of any weakness; the testimony of witnesses

and other items of evidence appearing in the case—show that he is not incapable of acting *sui juris.* Being legally capable, the judgments which it is the object of the bill to annul and enjoin (all of which were either by default or confession) are presumptively honest and valid. It is competent, however, to overthrow them by proof of fraud or of imposition or undue influence amounting to fraud when considered in the light of the defective mind of the plaintiff. The evidence, but for one thing, is almost strong enough for that purpose. The plaintiff's weakness of intellect, while not sufficient of itself to set aside the judgments, may be a very material item or link in a chain of evidence to establish fraud, and to it is added the circumstance of a formed design on the part of the defendants to possess themselves of this young man's valuable remainder interests in realty in Page county by getting him largely into their debt, and this with the knowledge that he was at least of inferior business capacity—from which the inference is easy, if not irresistible, that his weakness of intellect formed the foundation and basis of their plan to possess his property—a purpose that shocks the conscience and must be reprobated by every right thinking person. Persons who form and carry out plans of that sort will not ordinarily be scrupulous about the honesty of the means by which they accomplish their object.

"To the weakness of the plaintiff and the purpose deliberately formed to possess his estate, is added a course of dealing by the defendants themselves, and two or three other persons from whom the defendants themselves systematically and regularly took the trade notes of the plaintiff without recourse, from which in a period of five or six years" (the statement of this period being inadvertently so stated instead of about four years, the correct period, as admitted in oral argument on appeal)

"the plaintiff accumulated an indebtedness of some thirty thousand dollars or more, with nothing to show for it, and the defendants added to their fortune that much in the notes of the plaintiff. All of this looks suspicious, but the court cannot regard it as sufficient to annul the judgments in question, particularly in the absence of the testimony of the plaintiff himself. The plaintiff is undoubtedly capable of testifying, but he has not been introduced as a witness, and neither has his wife, who must have known something of his business transactions, and whose hearsay testimony has been injected into the evidence at several places. The plaintiff could probably have told quite a good bit about these transactions and about his business, and, if he could not, he would at least in his examination and cross-examination as a witness have furnished some practical demonstration to the court of his intelligence and capabilities. Both the plaintiff and his wife are competent and capable witnesses, who could have shed light on the case, and the court must infer that they would have been called, particularly the plaintiff himself, if their testimony would have helped the plaintiff or would not have been hurtful to his case.

"The decree will be for the defendants.

"I may say further that the plaintiff is by no means to be regarded as a low-grade imbecile. The expert witness, Dr. Ennett, who applied the Binet test to him, testified that there are three grades of moron—low, medium and high grade—but he did not say to which grade the plaintiff belongs. He further testified that the Binet test places the adult average intelligence at sixteen years; that is, the mental development of a child of sixteen years has been adopted as normal or average for the adult person. He also testified that when the Binet test was first formulated, the average of intelli-

gence was placed at fourteen years, and that it was later modified and the average normal intelligence was placed at sixteen years instead of fourteen—so that the plaintiff, who under that test shows the mental development of a child of fourteen and two-tenths years, is two-tenths of a year better than the standard of normal intelligence prescribed by the Binet test for adults as originally adopted.

"I may mention in passing that I have recently read in a magazine that seventy-five per cent. of the enlisted men in the American army in the world war showed a mental development of thirteen years or less under this test; that only a day or two ago I read in a Richmond paper of a traveling salesman who had been arrested for some offense to a woman on the street, who, when this test was applied to him, showed a development of eleven years.

"There is no direct evidence of any fraud or imposition upon the plaintiff either in the trading transactions or on obtaining the judgments against him. There is no evidence at all to show the elements or features of the particular transactions between the plaintiff and defendants, or the other persons from whom the defendants acquired the plaintiff's notes, other than the testimony of the opposing parties that they were given for cattle sold to plaintiff at a fair price, or to show what value the plaintiff received. So that there is no measure by which to make restitution to the defendants—to allow them the value actually received by the plaintiff—but if a decree goes in favor of the plaintiff at all, it must wholly obliterate the indebtedness claimed by the defendants and turn them out of court without a cent. While fraud or gross imposition upon an incapable person might justify such a course in a case where restitution is impracticable, the court cannot regard this

case as warranting such a decree, under the principle of
law applying to a suit to set aside a judgment for fraud
as established by the decisions of this State."

Thereupon the plaintiff, after such opinion was handed
down and before the decree under review was entered,
moved the court to enter the following decree of ref-
erence:

"This cause came on to be further heard this . . . . .
day of April, 1921, upon the papers formerly read, pro-
ceedings formerly had; upon the original and amended
bills of the plaintiffs and exhibits filed therewith, the de-
murrer, plea and answers of the defendants; upon the
depositions of witnesses and the exhibits accompanying
the same, the record of the cause, and was argued by
counsel.   Upon consideration whereof, being of opinion,
as appears from a memorandum of the court lodged with
the papers in this cause, that the evidence demonstrates
that M. A. Long was a person of weak intellect, which,
though not sufficient in itself to justify the relief prayed
for in the bill, is a very material item or link in the chain
of evidence to establish fraud, in connection with the
circumstances of a formed design on the part of the de-
fendants to possess themselves of M. A. Long's valuable
remainder in realty in Page county, by getting him
largely in their debt, with the knowledge on the part of
the defendants that he was at least of inferior business
capacity and that to the mental weakness of the plain-
tiff, and the purpose deliberately formed, to possess
themselves of his estate, there was added a course of
dealing by the defendants themselves and two or three
others, from whom the defendants systematically and
regularly took the trade notes of the plaintiff, without
recourse, the court, with a view of reaching a decision of
the case upon its merits, doth adjudge, order and decree

that this cause be referred to one of the commissioners of this court with directions to ascertain, state and report what, if anything, in money or money's worth, was the consideration received by M. A. Long, or to his use, passing from the defendants, or either of them, or the person or persons from whom they or either of them took the notes of M. A. Long, upon which judgment has been rendered as set out in the record in this cause, the value thereof and by whom furnished, the defendants to assume the burden of showing said consideration and of establishing the *bona fides* of the transaction out of which said notes grew. In making this inquiry, the said commissioner is authorized to consider the evidence already in the cause and such other evidence as may be introduced by any of the parties, first giving notice of the time and place of making said inquiry by personal service thereof upon the counsel of record in this cause."

But the court declined to enter a decree of reference and entered the decree under review, the provisions of which so far as material, are as follows:

"* * for reasons expressed in writing and, at the request of the plaintiff, lodged with the papers of the cause as part of this decree, the court doth adjudge, order and decree that the relief prayed for by the plaintiff be denied and that the bills of the plaintiff be dismissed, and that the defendants recover of Lee Long, the plaintiff's next friend, their costs in this behalf expended, with leave to sue out execution for the same."

*John T. Harris* and *D. O. Dechert,* for appellants.

*E. D. Ott* and *Ward Swank,* for appellees.

Sims, J., after making the foregoing statement, delivered the following opinion of the court:

The question upon which the decision of this case turns is as follows:

[1] 1. Were the judgments, and the notes upon which they were entered, obtained by the defendants by fraud by the use of undue influence upon M. A. Long, the maker of the notes, exerted either directly by the defendants themselves or indirectly through others in conspiracy with the defendants to defraud the said Long?

The question must be answered in the affirmative.

The law applicable is well settled and, indeed, is not the subject of any controversy between counsel, so that no review of the authorities cited will be here undertaken. We shall content ourselves with setting forth the statements in some of the authorities of the established principles which are pertinent to the case before us.

[2] As said in Chitty on Contracts, page 1050: "Although weakness of intellect, short of insanity, in one of the contracting parties, is no ground *per se* for invalidating a contract, it may have that effect if additional facts, betraying an intention to overreach, can be proved." This statement of the law is approved by this court in *C. & O. R. R. Co.* v. *Mosby*, 93 Va. at p. 94, 24 S. E. 916.

In 1 Elliott on Contracts, secs. 157-8-9, pp. 275-281, this is said: "The contract of a person mentally weak, on which account he is liable to imposition, will be set aside in courts of equity if the circumstances justify the conclusion that such party has not exercised a deliberate judgment but has been imposed upon or overcome by undue influence.

　　　*　　　　　*　　　　　*　　　　　*

[3] "In general, mere inadequacy of consideration uncombined with other circumstances does not afford sufficient ground for the rescission of a contract, or the cancellation of a written instrument. A contract will be

set aside for inadequacy of consideration only when a consideration is so grossly inadequate as to shock the conscience and then a court of equity interferes because under such circumstances it constitutes satisfactory evidence of fraud or undue influence. But this does not mean that inadequacy of consideration is not an important factor in determining the validity of a contract. It, in connection with other circumstances, may well be evidence of fraud or undue influence."

[4] In Black on Rescission and Cancellation, sec. 265, p. 700, the doctrine is stated: "While a contract made by a person of fair understanding should not be set aside merely because it was a rash, improvident, or hard bargain, yet if made with a person of impaired mind or feeble intelligence, the inference is that it was obtained by imposition, deception or undue influence, so as to cast upon the other party the burden of showing its fairness. And it is said that a comparatively slight degree of mental incapacity will justify a court in setting aside a contract for which no valuable consideration has been received. In these cases, also, it is not necessary that the inadequacy of the consideration should be such as to 'shock the conscience.' A court of equity will see to it that a bargain made with a person of weak intellect shall be fair."

In *Gates* v. *Cornett*, 72 Mich. 420, at p. 434, 40 N. W. 740, at p. 746, this is said: "The burden of proof was upon the complainant to show mental incompetency, and we think it has been made out. When a party deals with a man whom he knows to be of weak intellect, and the good faith of such dealings is challenged, the burden of proof is with the party who has dealt with the weak-minded person to show that no undue advantage was taken. The law throws its protecting shield around mentally incompetent persons, from whatever

cause, and while in some cases it is permitted them to make contracts so long as they are not under the restraint of guardianship, these are binding only so far as they rest upon adequate considerations, and are free from fraud or overreaching."

In 2 Pom. (3rd ed.) sec. 947, p. 1727, *et seq.*, the author says: "It is well settled that there may be a condition of extreme mental weakness and loss of memory, either congenital, or resulting from old age, sickness or other cause, and not being either idiocy or lunacy, which will, without any other incidents or accompanying circumstances, of itself destroy the person's testamentary capacity, and *a fortiori* be ground for defeating or setting aside his agreements and conveyances. It is equally certain that mere weak-mindedness, whether natural or induced by old age, sickness or other infirmity, unaccompanied by any other inequitable incidents, if the person has sufficient intelligence to understand the nature of the transaction, and is left to act upon his own *free* will, is not a sufficient ground to defeat the enforcement of an executory contract, or to set aside an executed agreement or conveyance. If, as is frequently, if not generally, the case, the mental weakness and failure of memory are accompanied by other inequitable incidents, and are taken undue advantage of through their means, equity not only may, but will, interpose with defensive or affirmative relief. Finally, in a case of real mental weakness, a presumption arises against the validity of the transaction and the burden of proof rests upon the party claiming the benefit of the conveyance or contract to show its perfect fairness and the capacity of the other party."

In *Todd* v. *Sykes*, 97 Va. at pp. 146-7, 33 S. E. at pp. 518, 519, this is said: "The burden of proof in this case is on the plaintiff to prove the fraud and undue influence

alleged in the bill, and such proof must be clear and convincing, but if *indicia* of fraud be proved so that fraud may be presumed from the circumstances and condition of the parties contracting, or if it is proved that the parties stood in an intimate and confidential relation, one to the other, either as parent or child, or in any other way, the burden of proof shifts to the defendant, and he is obliged to repel by strong and clear evidence the presumptions of fraud and undue influence arising from the circumstances of the transaction and the relations of the parties, and in such cases he must prove the truth of the defense set up in his answer. *Fishburne* v. *Ferguson,* 84 Va. 111, 4 S. E. 575; *Hickman* v. *Trout,* 83 Va. 491-2, 3 S. E. 131; Waite on Fraud. Con. secs. 225 and 271; Bump on Fraud. Con. secs. 249, 256, and note to 67; and *Francis* v. *Cline,* 96 Va. 201, 31 S. E. 10.

"If from the relations of the parties and the surrounding circumstances a doubt is thrown around the payment in good faith of the consideration for the conveyance of the property, the grantee must prove the payment of the consideration (*Hickman* v. *Trout, supra*).

\*          \*          \*          \*

[5] "It is not necessary to prove fraud by direct and positive evidence. Circumstantial evidence is not only sufficient, but in most cases is the only proof that can be adduced. *Armstrong, etc., Co.* v. *Lachman,* 84 Va. 728, 6 S. E. 129; *Moore* v. *Ullman,* 80 Va. 311; *Hickman* v. *Trout, supra; Saunders* v. *Parrish,* 86 Va. 592, 10 S. E. 748; *Ferguson* v. *Daughtrey,* 94 Va. 308, 26 S. E. 822; *Hazlewood* v. *Forrer,* 94 Va. 703, 27 S. E. 507; *Francis* v. *Cline, supra.*

"A transaction may of itself and by itself furnish the most satisfactory proof of fraud, so conclusive as to outweigh the answer of the defendant and even the evidence of witnesses. *Jones* v. *McGruder,* 87 Va. 360,

379, 12 S. E. 792, and authorities cited; *Hazelwood* v. *Forrer, supra.*"

In *Fitzgerald* v. *Frankel*, 109 Va. 605, 64 S. E. 942, is quoted with approval, the following excerpt from *Hazlewood* v. *Forrer*, 94 Va. 703, 27 S. E. 507:

"A transaction may of itself and by itself furnish the most satisfactory proof of fraud, so conclusive as to outweigh the answer of defendants, or even the evidence of witnesses. The circumstances attending and following a transaction are often of such character as to leave not even a shadow of a doubt as to the real object and motive of the parties engaged in it.  *  *  *  Experience attests that in a majority of cases fraud can only be established by circumstances. The motives and intentions of the parties can only be judged by their actions, and the nature and character of the transaction in which they are engaged. They often furnish more conclusive evidence than the most direct testimony."

On applying these principles to the evidence in this cause we are of opinion that the fraud of the defendants in question has been proved. The material facts, as we consider them clearly and convincingly established by the evidence, are set forth in the statement preceding this opinion and need not be restated here.

[6] We do not think that young Long was incapable of making any valid contract. He was capable of making simple contracts and of arriving at reasonable conclusions from uncomplicated facts, where his mind was not influenced to the contrary by the suggestions of others. But, as especially material in this case, his weakness was that he was abnormally subject to the influence of any one who chose to exert it in order to dominate and direct his action in any business matter. As said in *Gates* v. *Cornett, supra* (72 Mich.. at p. 427, 40 N. W. at p. 742, a case strikingly similar in its facts to

that before us): "He could transact business with honest people without detriment or loss to himself, but easily fell a prey to the vicious and designing."

[7] This view of the case (and the facts that young Long was robust and amiable, and was, as is admitted by the testimony for the defendants, absolutely honest, being himself a menace to no one, and having therefore the natural right to enjoy the use of his own property and to live his life in an environment best suited to his capacities) satisfactorily accounts for the circumstances referred to in the opinion of the court below—(namely, of the marriage, of the son being entrusted by the father with the control of valuable property, of his service as a juror, which was at a single term of court and upon simple cases, involving no difference of opinion among the other jurors, and the "other items of evidence appearing in the case")—consistently with the fact that the young man, in his business dealings was, in truth, but as wax when in the hands of designing men. This view, too, accounts for practically all of the testimony of the witnesses for the defendants, who express opinions favorable to the competency of young Long, except the testimony of the defendants themselves, and that of Neff and Taylor; as such other testimony, without exception, was given by witnesses who never tried and never saw anyone else try to exert any dominating influence over the young man and had the simplest of transactions with him, if any, and in many cases none at all.

[8] In view of the evidence actually in the cause, we do not feel that the conclusion we have reached therefrom is affected by the failure of the father to take the deposition of the son or of his wife. The deposition of the son would have given the court no personal observation of his demeanor and the actual failure of the

father to get any help from him when trying to ascertain the facts to be introduced in evidence, and while depositions were being taken in this cause, and the known propensity of the son to fabricate statements of fact and his vanity and unconsciousness of his own defects, fully justified the action of not taking the son's deposition, as we think.    The deposition of the wife was not vital to the case for the plaintiff; and the probability that her testifying would have been considered by the son, her husband, as hostile to him, is of itself a sufficient excuse for not putting her upon the witness stand.

[9] 2. With respect to the measure of the restitution which the plaintiff should make to the defendants—we think that a decree of reference—similar to the part of the draft for a decree on that subject which was tendered by the plaintiff, but rejected by the court below, will accomplish an equitable result.

[10] It is well settled that, even where a contract is set aside for fraud in its procurement, the party at whose suit the rescission is granted must return whatever value he has received under the contract; but where by the acts of the adversary party complete restoration is rendered impossible, rescission will not thereby be defeated.    That is to say, where a note, or judgment thereon, is rescinded for fraud, the maker of the note must, so far as the acts of the payee leave it practicable, account for the benefit he has received in the transaction.    3 Elliott on Contracts, sec. 2434, 2435; *Gates* v. *Cornett, supra* (72 Mich. at pp. 435-6, 40 N. W. 740).

[11] In the case last cited the court held that this rule applied to contracts set aside on the ground of undue influence upon the plaintiff, who was a person of weak mind, and the appellate court there undertook, from the evidence in the record, to ascertain and decree the amount for which it would allow the contracts (being

mortgages) to stand as supported by actual considera-
tion received therefor, and declined to refer the case to
a master for that purpose, saying "If we fail, through
insufficient testimony, to allow the defendant as much
as we ought, it will be owing to his own fault in not fur-
nishing the proof." The evidence in that case, how-
ever, was more specific than in the case before us on the
subject of the actual consideration received by the plain-
tiff; and we feel that equity will be more nearly done
and the ends of justice more fairly attained by reference
of the cause to a master on the question of the actual
consideration furnished to the plaintiff. But on such
reference, upon the principles above alluded to, the de-
fendants should bear the burden of proof of the actual
consideration which was furnished to young Long for
the notes on which the judgments were entered, such
consideration to be ascertained by computing as nearly
as practicable, from the evidence now in the record and
such as may be introduced before the master in behalf
of the plaintiff or defendants, the amount of money and
of the market value, at the time it was received, of all
the property received by young Long in all of his trans-
actions with the defendants and with said Neff, Taylor
and Sellers and Taylor, and deducting therefrom the
amount of money and the market value, at the time it
was received, of the property obtained by such parties
or any of them, from young Long, in all of their trans-
actions with him; and the judgments should be allowed
to stand in favor of the respective defendants for such
amount or amounts only, if any, as the defendants may
show affirmatively are supported by valuable consid-
eration.

The decree under review will therefore be reversed
and the cause remanded to the court below, with direc-
tion that such decree of reference be therein entered as

is above indicated and for further proceedings not in conflict with the views expressed in this opinion.

The death of D. B. Harrison, pending this appeal, having been suggested, the cause may be revived in the court below and thereafter proceed to final decree against his personal representative.

*Reversed and remanded.*